**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALLISON BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:26-cv-01143-CRC |
| | ) | |
| WASHINGTON UNIVERSITY, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR FOR IMPROPER VENUE OR, IN THE ALTERNATIVE, FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

REQUEST FOR JURISDICTIONAL DISCOVERY ........ 6

ARGUMENT ........ 6

I. PLAINTIFF IS PRO SE ........ 6

II. THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS ........ 7

A. D.C. Code § 13-334(a) Confers General Jurisdiction Over Defendant The Washington University ("WashU") ........ 7

B. General Jurisdiction ........ 8

C. D.C.'s Long Arm Statute Confers Jurisdiction Over All Defendants ........ 9

1. Defendants' Tortious Actions and/or Omissions in the District Subject them to this Court's Jurisdiction ........ 10

2. Defendants' Tortious Actions and/or Omissions Outside of the District of Columbia Subject them to this Court's Jurisdiction ........ 11

D. Conspiracy Theory Confers Specific Jurisdiction Over All Defendants ........ 11

III. MISSOURI MAY NOT HAVE JURISDICTION OVER DEFENDANTS OSGOOD, HUDSON, AND KATZ BECAUSE THEY ARE NOT MISSOURI RESIDENTS AND MANY ACTIONS TOOK PLACE OUTSIDE OF MISSOURI ........ 24

IV. WASHINGTON D.C. IS THE PROPER VENUE ........ 25

V. PLAINTIFF HAS PROPERLY PLED ALL CLAIMS AGAINST DEFENDANTS ........ 27

A. Count I – Title VII ........ 27

B. Count II – Title VI ........ 29

C. Count III – 42 U.S.C. § 1981 .......... 29

D. Count IV– Fraud and Unjust Enrichment.......... 33

E. Count V – Intentional Infliction of Emotional Distress .......... 34

F. Count VI - Negligence .......... 36

G. Count VII - Breach of Contract .......... 37

H. Count VIII - Defamation .......... 38

I. Count IX – 42 U.S.C. § 1985 Conspiracy to Interfere with Civil Rights .......... 38

J. Count X - 20 U.S.C. § 1681 Title IX Claims.......... 39

K. Count XI - Amendment V and XIV of the US Constitution .......... 41

L. Count XII - 42 U.S.C. § 1983 .......... 42

M. Count XIII District of Columbia Human Rights Act .......... 43

VI. Conclusion .......... 45

Exhibit A - Consortium Agreement .......... 46

Exhibit B - Defendant WashU Unilateral Revocation of Scholarship for 2023-2024 .......... 47

Exhibit C - Issuance of Scholarship on July 27, 2023 .......... 49

Exhibit D - Correspondence from US Dept of Educ. regarding Consortium Agreement .......... 51

Exhibit E - EEOC Right to Sue .......... 53

Exhibit F - Plaintiff's W-2 from Defendants - Not an Independent Contractor .......... 57

Exhibit G - Retaliation for Protected Activity ..........58

Exhibit H - WashU Conspiracy E-mails .......... 65

Exhibit I - Defamatory Student Conduct Board Determination - Indelible School Record Furnished to Plaintiff's Employers and Prospective Bar Associations as late as April 2026 .......73

Exhibit J - Instagram Screenshots; Millions of Views, Thousands of Comments ....................... 83

Exhibit K - Plaintiff's Service to Defendants' Registered Agent ............................................... 86

## TABLE OF AUTHORITIES

**Cases**

*AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 850 (D.C.1981)..................................... 9

*Banks v. Chesapeake & Potomac Telephone Co.*, 802 F.2d 1416 (D.C. Cir. 1986)................ 29, 30

*Bason v. American University*, 414 A.2d 522, 525 (D.C. 1980) ................................................ 37

*Bell v. Maryland*, 378 US 226 (1964) .......................................................................... 42

*Brady v. Livingood,* 360 F.Supp.2d 94, 104 (D.D.C.2004) ....................................................... 12

*Brown v. Whole Foods Market Group, Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) ........................ 6

*Bryant v. Pepco*, 730 F. Supp. 2d 25, 31-32 (D.D.C. 2010) ...................................................... 27

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ……………………...……27

*Cavalier v. Catholic Univ. of Am.*, 513 F. Supp. 3d 30 (2021) ………………..………………... 40

*Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) …………………………….. 28

*Cole v. Boeing Co.*, 845 F. Supp.2d 277, 284 (D.D.C. 2012) .................................................... 44

*Comcast Corp. v. Nat'l Assoc. of African-American Owned Media*, 589 U.S. 327 (2020) ......... 33

*Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) ..................................................................... 8

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) …………………………………... 39

*Dent v. May Department Stores Co.*, 459 A.2d 1042, 1044 (D.C. 1982) ………..…………….. 42

*Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 732 (D.C. 2000) …..… 4

*Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 7 (D.D.C. 2009)5, 22

Faniel v. *Chesapeake & Potomac Telephone Co.*, 404 A.2d 147, 151 (D.C. 1979) .................... 42

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021) ............... 11, 12

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-81 (1998) ........................................ 39

*Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661 (1987) .......................................................... 30

*Greene v. Howard University*, 412 F.2d 1128, 1135 (1969) ........................................................ 37

*Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 577 (D.C. 2007)................................................. 35

*Griffin v. Maryland*, 378 U.S. 130, 135 (1964) ............................................................................ 42

*Himmelstein v. Comcast of the Dist., LLC*, 908 F. Supp. 2d 49, 59 (D.D.C. 2012) ..................... 33

*Hobson v. Wilson*, 737 F.2d 1, 14 (1984) ...................................................................................... 38

*Hoskins v. Howard Univ.*, 839 F. Supp. 2d 268 (2012) ............................................. 27, 28, 34, 35

*Jones v. Bernanke,* 557 F.3d 670, 677, (D.C. Cir. 2009) ........................................................... 27

*Lewis v. Full Sail, LLC*, 266 F. Supp. 3d 320, 323 (D.D.C. 2017) ............................................... 8

*Mallory v. Norfolk Southern Ry.*, 600 U.S. 122 (2023) ................................................................ 8

*Mandelkorn v. Patrick*, 359 F. Supp. 692 (D.D.C. 1973) ........................................................... 12

*Marsh v. Alabama*, 326 US 501 (1946) ........................................................................................ 42

*Miller v. Toyota Motor Corp.*, 620 F. Supp. 2d 109 (D.D.C. 2009) .............................................. 9

*Monteilh v. AFSCME, AFL–CIO*, 982 A.2d 301 (D.C. 2009) .................................................... 44

*Nader v. Allegheny Airlines, Inc.*, 512 F.2d 527, 541 n. 32 (D.C. Cir. 1975).............................. 33

*Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) ....................................................................... 38

*Pennsylvania Fire Ins. Co. of Phil. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917) .... 8

*Pride v. Howard University*, 384 A.2d 31, 35 (D.C. 1978) ........................................................ 37

*Purcell v. Thomas*, 928 A.2d 699, 711 (D.C. 2007) .................................................................... 34

*Ramamurti v. Rolls-Royce Ltd.*, 454 F. Supp. 407 (D.D.C. 1978) ................................................ 9

*Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 71-72 (D.D.C. 2007) ................................................ 27

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ............................................................................. 27

*Shelley v. Kraemer*, 334 US 1 (1948) ........................................................................................... 41

*Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 398 (D.C. 1991) ....... 43

*Slaughter v. Atlantic C. L. R. Co*., 302 F.2d 912, 914-915 (1962)................................................36

*Smith v. Howard Univ.*, 605 F. Supp. 3d 103 (D.D.C. 2022) ...................................................... 30

*Spence v. U.S. Dep't of Veterans Affs.,* 109 F.4th 531, 536-38 (D.C. Cir. 2024)............................ 7

*Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 21 (D.D.C. 2017) ................................. 5

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998) ................. 44

*Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 91 (D.D.C. 2019) .......................................... 29

*Zelaya v. UNICCO Serv. Co.*, 587 F. Supp. 2d 277, 284-85 (D.D.C. 2008) ............................... 44

*1901 Wyoming Avenue Cooperative Ass'n v. Lee*, 345 A.2d 456, 461-62 & n.11 (D.C. 1975) ... 37

**Federal Statutes**

20 U.S.C. § 1681 (Title IX) .......... 39

28 U.S.C. § 1391(b) .......... 2, 25, 26

42 U.S.C. § 1981 .......... 29

42 U.S.C. § 1983 .......... 42

42 U.S.C. § 1985 .......... 38

42 U.S.C. § 2000d (1988) (Title VI) .......... 29

42 U.S.C. § 2000e-3(a)) (Title VII) .......... 27

**State Statutes**

D.C. Code § 2-1401.02(10) .......... 44

D.C. Code § 2-1403.16(a) .......... 44

D.C. Code § 13-334(a) .......... 1, 2, 6, 7, 8, 9

D.C. Code § 13–423 (District of Columbia Long-Arm Statute) .......... 2, 3, 6, 9, 10, 11

§ 506.500 RSMo (Missouri's Long Arm Statute) .......... 24

**Law Review Articles**

Leigh J. Jahnig, *Under School Colors: Private University Police As State Actors Under Section 1983*, 110 Nw. U. L. Rev. 249 (2015) .......... 43

# INTRODUCTION

Defendant, The Washington University ("WashU"), has been registered with the Washington D.C. Department of Licensing and Consumer Protection ("DLCP") to provide educational services in Washington D.C. since August 3rd, 1999, maintains a D.C. Campus at 1776 Massachusetts Avenue N.W., Suite 705 Washington, D.C. 20036, and possesses a D.C. registered agent, Ian Dubin, whom Plaintiff served with the Amended Complaint on June 29th, 2026. Accordingly, this Court has jurisdiction over Defendant WashU and its agents under D.C. Code § 13-334(a). Nevertheless, Defendants have objected to the constitutionally reasonable exercise of personal jurisdiction over them.

Defendants state that the crux of the Complaint is that WashU temporarily suspended her from campus for six months while investigating whether or not she violated the Student Code of Conduct. **Incorrect**; that couldn't be further from the truth. The crux of this action before the court is a Washington D.C. contract dispute, hereafter referred to as the Consortium Agreement, wherein two private universities in Washington D.C. contracted to provide educational services to WashU's former employee and student, Plaintiff, Allison Brown, in the District of Columbia. Defendant WashU forced Plaintiff to attend Georgetown University Law Center (hereafter, "GULC"), and unilaterally revoked Plaintiff's $37,000.00 a year scholarship through the Consortium Agreement in retaliation for Plaintiff's alleged role, alongside 4 of her white classmates, in Defendant Elizabeth Katz's firing due to Plaintiff's complaints of race and/or sex discrimination and retaliation.

This Court is the *only* District Court in the United States where Plaintiff is able to bring claims regarding the Consortium Agreement because of Missouri's uniquely limited long arm statute. Defendants, upon their own admission, live all over the country - in Michigan, Florida,

Massachusetts, and Missouri. And today, after WashU's myriad attempts to sabotage Plaintiff's legal career, Plaintiff lives and works in Washington D.C. Thus, this Court is the only proper venue to adjudicate this matter under 28 U.S. Code § 1391(b)(2) or (b)(3). Plaintiff respectfully requests for this court to enter an order granting personal jurisdiction over all Defendants, denying Defendants' Motion to Dismiss, and granting jurisdictional discovery as appropriate.

## FACTUAL BACKGROUND

Plaintiff filed the operative complaint on June 29th, 2026 (Amended Complaint, ECF 11). Plaintiff served Defendant WashU's agent, Ian Dubin with the same, on June 29th, 2026. (Am. Compl. ECF 22 at ¶ 1) Defendants have not objected to service yet, nor within the 21 day deadline - which would have been July 20th, 2026. Accordingly, Defendant WashU has been served in the District of Columbia through their registered agent, and is subject to personal jurisdiction under D.C. Code § 334(a). Defendant WashU maintains a regular course of business in the District as they have licensed a trade name with DLCP, and maintain a license to provide educational services in the District of Columbia through DLCP. One of Defendants' myriad educational service contracts in the District of Columbia is the Consortium Agreement, where Plaintiff, upon Defendants' express direction and control, was forced to finish her degree program in the District of Columbia at GULC. (Am. Compl. ECF 11 at ¶¶ 1-91)

The Consortium Agreement details a Washington D.C. transaction - where WashU acted as a surety for Plaintiff's matriculation into GULC, subjecting themselves to jurisdiction in D.C. under D.C.'s long arm statute, D.C. Code § 13–423(a)(6). (Am. Compl. ECF 11 at ¶ 148, Exhibit A) Plaintiff, in exchange for complying with Defendants' order that Plaintiff must leave the WashU community, was guaranteed by Defendants to receive an education on GULC's campus in Washington D.C. through the Consortium Agreement, subjecting them to jurisdiction under

D.C.'s long arm statute, § 13–423(a)(2). (Am. Compl. ECF 11 at ¶ 148, Exhibit A) Plaintiff was also the intended third party beneficiary of the Consortium Agreement between WashU and GULC, as Plaintiff's name is listed at the top of the Consortium Agreement. (Am. Compl. ECF 11 at ¶ 148, Exhibit A, Exhibit D) Defendants now maintain that Plaintiff owes Defendant - to the date of this filing - $40,294.00. (Am. Compl. ECF 11 at ¶ 144, Exhibit A, Exhibit B)

Since May 2024, when Plaintiff finished her final year of law school at GULC, Defendants WashU, Osgood, Walsh and Burns have sent Plaintiff numerous collection notices in connection with Consortium Agreement that was performed in Washington D.C. at GULC from July 2023 to May 2024. (Exhibit A) Today, Plaintiff's WashU account still shows a balance outstanding of $40,294.00 in connection with the Consortium Agreement to be performed in Washington D.C. at GULC. (Exhibit A, Exhibit B) If Plaintiff truly owed Defendant WashU $40,294.00 today, then Plaintiff would have paid a total of $115,033.02 through combined cash payments and WashU scholarships for 2023-2024 tuition when Plaintiff was a visiting student at GULC while a full time student at WashU under the Consortium Agreement. (Exhibit A) Nonetheless, Defendants are attempting to collect $40,294.00 from Plaintiff in Washington D.C. in connection with the Consortium Agreement - because that is where she lives and works. (Exhibit A)

On July 27th, 2023, Defendants issued Plaintiff a $37,000 scholarship for the 2023-2024 school year, contingent only upon Plaintiff maintaining full time status, which Plaintiff did. (Exhibit C) On August 2nd, 2023, Plaintiff paid to Defendant WashU $17,455.02 cash for the 2023-2024 school year's tuition and later withdrew two $10,250 loans, or a total of $20,500.00 in FAFSA loans for payment of tuition for the 2023-2024 school year at GULC pursuant to the Consortium Agreement. Plaintiff did not receive any of the FAFSA loan money. (Exhibit D)

On August 15th, 2023, Defendants Osgood, Walsh, Gore, Wendler-Modde, and Burns unilaterally revoked Plaintiff's $37,000.00 annual scholarship via e-mail after demanding that Plaintiff enroll at GULC for her third year of law school, pursuant to the Consortium Agreement. (Am. Compl. ECF 11 at 1) Defendants WashU, Osgood, Walsh, and Burns did not pay the tuition under the Consortium Agreement, breaching the Consortium Agreement. Plaintiff was unable to register for classes until she contacted the Department of Education in Washington D.C. (Exhibit D) Defendants WashU, Osgood, Walsh, and Burns told Plaintiff that she was responsible for paying GULC directly additional funds despite Plaintiff having already paid Defendant WashU more than enough to cover Plaintiff's first semester tuition at GULC. Defendants were intent on further retaliating against Plaintiff, as they wanted Plaintiff to suffer because her complaints about race and/or sex discrimination and retaliation allegedly made: 1) four white students complain about Defendant Katz's racist classroom behaviour, resulting in Defendant WashU firing Defendant Katz, 2) several white classmates approach a white hispanic classmate and tell her that she thinks just like the Plaintiff because they are both women of color, and 3) white classmates feel uncomfortable regarding the topic of race.(Am. Compl., ECF No. 11) (Exhibit G)

Defendants have never disputed that at some point in the Fall of 2023, WashU received $10,142.00 ($10,250.00 minus $108.00 in fees) in student loans, and $17,455.02 in cash from Plaintiff. (Exhibit D) Thus, Plaintiff should have been credited for paying WashU $46,097.02 in cash and scholarship towards GULC tuition of $37,975.00 under the Consortium Agreement (half of the $75,950.00 tuition) and a $2,500.00 WashU health insurance charge. (Exhibit M to Amended Complaint, ECF 11) Plaintiff's payments and scholarship exceeded the GULC tuition and health insurance due by approximately $5,622.02, Defendants' ledger after performance of the Consortium Agreement does not and has never reflected the same. (Exhibit C, Exhibit D)

Regarding Plaintiff's Spring 2024 charges, Plaintiff should have been credited for the $5,622.02 overpayment from Fall 2023, $10,142.00 student loan payment and $18,500.00 scholarship, or $34,264.02 to put toward the Spring 2024 GULC payment due of $37,975. Instead, Defendant WashU now demands that Plaintiff pay $40,294.00, an amount far exceeding the difference between the Plaintiff's payments and scholarship and GULC Spring 2024 tuition pursuant to the Consortium Agreement. Defendant refuses to resolve this matter outside of the Courts, thus Plaintiff is here before this Court, as this Court has the most jurisdictional and venue relevancy to her claims.

Plaintiff respectfully submits that Defendant is claiming Plaintiff owes Defendant WashU $40,294.00 as part of a retaliatory conspiracy because Plaintiff complained of race and/or sex discrimination and retaliation. To this day, Defendants continue to retaliate against Plaintiff pursuant to the Consortium Agreement, maintain that Plaintiff owes Defendant WashU $40,294.00, and have threatened Plaintiff, a Washington D.C. resident, with collections actions regarding the same. Further, on or around June 1st, 2026, Defendant WashU revoked her e-mail account (allison.brown@wustl.edu) when it is generally Defendants' practice to allow alumni similarly situated to Plaintiff to maintain their e-mail accounts. This Court is the *only* venue in which Plaintiff can bring her claims relating to their retaliation against Plaintiff through the Consortium Agreement.

A contractual provision that "the contract is to be performed, in whole or in part, in D.C." is usually sufficient to create "a substantial connection between the contract and the forum." *Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 7 (D.D.C. 2009) "The Court . . . insofar as it must resolve a challenge to personal jurisdiction, the Court may look beyond the allegations of the complaint' to do so." *Triple Up Ltd. v. Youku Tudou Inc.*, 235

F. Supp. 3d 15, 21 (D.D.C. 2017). Thus, Plaintiff prays for this court to consider all of her filings and the attached exhibits find personal jurisdiction over Defendants.

Plaintiff respectfully submits through this brief that WashU and the other named Defendants have purposefully availed themselves to this Court through two theories of personal jurisdiction, namely: 1) the D.C. Long Arm Statute § 13–423 and 2) the common law conspiracy theory of long arm jurisdiction under the District of Columbia's long arm statute. This memorandum details Defendants' acts and omissions within the District of Columbia. This controversy is ongoing, and requires adjudication by this Court because it centers upon a D.C. Contract that cannot be litigated in any other forum. Thus, Plaintiff respectfully requests that this Court enter an order finding personal jurisdiction over all Defendants.

## REQUEST FOR JURISDICTIONAL DISCOVERY

Accordingly, Plaintiff respectfully requests jurisdictional discovery if the Court is unable to find personal jurisdiction over all Defendants under: 1) D.C. Code § 13–334(a), and/or 2) the D.C. Long Arm Statute § 13–423 by establishing personal jurisdiction over all Defendants, and/or 3) the common law conspiracy theory of long arm jurisdiction under the District of Columbia's long arm statute.

## ARGUMENT

### I. PLAINTIFF IS PRO SE

A pro se plaintiff is required to plead "factual matter that permits [us] to infer more than the mere possibility of misconduct." *Brown v. Whole Foods Market Group, Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015). The Court, as it must in a case brought by a *pro se* plaintiff, draws the well-pled facts from both the Complaint and Plaintiff's Opposition to Defendant's Motion to

Dismiss, taking them to be true. *Id*. (Courts should consider "the facts alleged in all of [a *pro se* plaintiff's] pleadings" when evaluating a motion to dismiss). *Id*.

Defendants have asked this court to analogize Plaintiff Allison Brown in this action to Plaintiff Jo Spence in *Spence v. U.S. Dep't of Veterans Affs.,* 109 F.4th 531, 536-38 (D.C. Cir. 2024). Plaintiff Jo Spence was not considered pro se because she held over a decade of attorney experience at the Department of Veterans Affairs, 36 years of legal work experience, and was given "litigation-related work assignments and those that required coordination with the Litigation Team" for over ten years. *Id*. In contrast, Plaintiff Brown has been an attorney for less than two months, and a paralegal for two years in a transactional/regulatory practice group. This action is Plaintiff Brown's first litigation-related assignment. The facts are not analogous in the slightest with respect to the Plaintiff Brown's "legal training." *Id*. Thus, Plaintiff Brown should be afforded pro se status.

## II. THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS.

### A. D.C. Code § 13-334(a) Confers General Jurisdiction Over Defendant The Washington University ("WashU")

D.C. Code § 13-334(a) "Service On Foreign Corporations" provides: "In an action against a foreign corporation doing business in the District, process may be served on the agent of the corporation or person conducting its business . . . and that service is effectual to bring the corporation before the court." *Id*. Defendant WashU has conducted research and educational services in Washington D.C. since at least August 3, 1999. (Am. Comp. ECF 11, ¶¶ 1-90, Exhibits A-C.) Plaintiff served Defendant WashU's registered agent, Ian Dubin, with process via ECF on June 29th, 2026. (Exhibit A). That service is "effectual to bring the corporation [WashU] before the court." D.C. Code § 13-334(a).

Defendants do not contest the fact that Defendant WashU has a registered agent and has registered to do business in Washington D.C. since August 3, 1999 using registered trade names. Further, Defendants do not contest the fact that WashU's registered agent, Ian Dubin, was served by Plaintiff via ECF on June 29, 2026. Also, Defendants do not address D.C. Code § 13-334(a) in any of their filings. Thus, Defendant WashU should be subject to personal jurisdiction in D.C.

**B. General Jurisdiction**

The Court "may exercise one of two types of personal jurisdiction: (1) "general or all-purpose jurisdiction" or (2) "specific or case-linked jurisdiction." *Lewis v. Full Sail, LLC*, 266 F. Supp. 3d 320, 323 (D.D.C. 2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). **Both exist here.**

General jurisdiction "arises from a party's contacts with the forum that are unrelated to the particular claims in the litigation." *Id*. citing *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414-17 (1984)).

Defendants' reliance on *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) is inappropriate, given that none of the Defendants are subsidiaries. Plaintiff's facts are much more analogous to *Mallory v. Norfolk Southern Ry.*, 600 U.S. 122 (2023). In this case, the Court found jurisdiction over a Defendant registered to do business in Pennsylvania in light of its "regular, systematic, [and] extensive" operations there, even though Plaintiff resided in Virginia and worked for Defendant in Ohio and Virginia. Id. at 266 A.3d 542,562' see 15 Pa. Cons. Stat. § 411(a)). *Mallory* followed *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917), which found that suits premised on such grounds did not deny a Defendant due process of law, and the Pennsylvania Supreme Court erred in finding that intervening decisions had implicitly overruled *Pennsylvania Fire*. Defendant WashU has also

registered with DLCP to do business in Washington D.C., in light of its regular, systematic and extensive educational services offered just like the Defendant in *Mallory* and is similarly subject to personal jurisdiction under § 13-334(a)). (Am. Compl. ECF No. 11, *See also* ECF No. 22)

Further, under District of Columbia law, courts may exercise general jurisdiction over a foreign corporation as to claims not arising from the corporation's conduct in the District if the corporation is doing business in the District; the reach of doing business jurisdiction is co-extensive with the reach of constitutional due process, which makes general jurisdiction permissible if the defendant's business contacts with the forum are continuous and systematic. *Miller v. Toyota Motor Corp*., 620 F. Supp. 2d 109 (D.D.C. 2009).

The D.C. Court of Appeals has held that under the statute "a foreign corporation which carries on a consistent pattern of regular business activity within the jurisdiction is subject to the general jurisdiction of our courts, upon proper service, and not merely for suits arising out of its activity in the District of Columbia." *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 850 (D.C.1981). In *Ramamurti v. Rolls-Royce Ltd.*, 454 F. Supp. 407 (D.D.C. 1978), the Court found that activities descriptive of relations with private purchasers rather than with instrumentalities of the federal government would constitute the doing of business within the meaning of § 13-334(a). Similarly, WashU was doing business with GULC; both private universities were using the Consortium Agreement to provide educational services for Plaintiff. Therefore, Defendant WashU is subject to this Court's personal jurisdiction under § 13-334(a).

**C. The D.C. Long-Arm Statute Confers Jurisdiction Over All Defendants**

D.C.'s Long Arm Statute, located at D.C. Code § 13–423 states:

(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's —-
(1) transacting any business in the District of Columbia;
(2) contracting to supply services in the District of Columbia;

> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;
> (5) having an interest in, using, or possessing real property in the District of Columbia;
> (6) contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of contracting, unless the parties otherwise provide in writing;. . .
> (E) Notwithstanding the provisions of subparagraphs (A) through (D), the court may exercise personal jurisdiction if there is any basis consistent with the United States Constitution for the exercise of personal jurisdiction.
> (b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

Plaintiff respectfully requests this Court to exercise personal jurisdiction over all Defendants, as all Defendants have satisfied at least one of the provisions in the long-arm statute.

**1. Defendants Tortious Actions or Omissions in the District of Columbia Subject Them to This Court's Jurisdiction**

In accordance with D.C. Code § 13–423(a)(3), Defendants WashU, Osgood, Walsh, Peggy Smith, Angela Smith, Davis, and Katz caused tortious injury in the District of Columbia by intentionally failing to provide a timely letter of good standing in support of Plaintiff's transfer application to GULC, an omission in Washington D.C. (Am. Compl. ECF 11 at 1, ¶¶ 183-189) This failure was intentional, and constitutes negligence at a minimum. The aforementioned Defendants' omissions were intentional so that they could continue to punish and commit tortious injury against Plaintiff from the beginning of her second year of law school to this day. Defendants WashU, Osgood, Katz, and Walsh also caused tortious injury in the District of Columbia by interfering with Plaintiff's internships in Washington D.C. during her second and third years of law school: acts in Washington D.C. (See ECF 11, Am. Compl. ¶¶ 324-326)

Additionally, in accordance with D.C. Code § 13–423(a)(1-6), Defendants WashU, Elizabeth Walsh, Russell Osgood, through their agent, Defendant Carrie Burns, transacted business in the District of Columbia, contracted to supply services in the District of Columbia, and caused tortious injury in the District of Columbia using real property (the GULC campus) in the District of Columbia by signing the Consortium Agreement between GULC and WashU and breaching the same. Please see the Discussion Items 5, 7, 9-12 in Section II. D. of this Memorandum for a list of tortious actions occurring in Washington D.C. Thus, Defendants' tortious actions within the District of Columbia subject them to this Court's Jurisdiction.

**2. Defendants' Tortious Actions Outside of D.C. Subject Them to this Court's Jurisdiction**

Please see the Discussion Items 1- 4, 6, and 8 in Section II. D. of this Memorandum for a list of tortious actions committed by Defendants outside of the District of Columbia. Items 1-4 and 6 in Section II. D. occurred in Missouri and Item 8 in Section II. D. occurred while Plaintiff was in Maryland. Because each of Defendants' tortious acts were committed to discriminate and retaliate against Plaintiff because she is Black and engaged in protected activity, resulting in the breach of the Consortium Agreement in the District of Columbia and Plaintiff's subsequent impoverishment, they subject all of the Defendants to this Court's jurisdiction. (Exhibit A, Exhibit B)

**D. Conspiracy Theory Confers Specific Jurisdiction Over All Defendants**

The law of specific jurisdiction seeks to ensure that States with "little legitimate interest" in a suit do not encroach on States more affected by the controversy. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021). The Supreme Court has held regarding specific jurisdiction: **"**None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do. As just noted, our most

common formulation of the rule demands that the suit "arise out of *or relate to* the defendant's contacts with the forum." *Id.* The Consortium Agreement was to be performed upon Defendants' direction and control by Plaintiff in Washington D.C. Defendants then breached that agreement, supporting the conspiracy theory of jurisdiction over each Defendant.

A conspiracy is a "combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an *agreement* between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Brady v. Livingood,* 360 F.Supp.2d 94, 104 (D.D.C.2004) Co-conspirators have long been held to an agency relationship when overt acts are done in furtherance of the conspiracy:

> If sufficient allegations appear of the acts of one defendant among the conspirators, causing damage to plaintiff, and the act of the particular defendant was done pursuant to the conspiracy, during its course, in furtherance of the objects of the conspiracy, with the requisite purpose and intent . . . then all defendants are liable for the acts of the particular defendant under the general principle of agency on which conspiracy is based.

*Mandelkorn v. Patrick*, 359 F. Supp. 692 (D.D.C. 1973)

In any other university setting, Plaintiff would never have been subjected to Defendants' conspiracy, and the level of race and/or sex discrimination and retaliation that she encountered from Defendant University. Surely, someone, somewhere in the University would have said at some point, "This is race discrimination", "This is sex discrimination,""This is retaliation", or, at the very least, "We are now exposed to enormous liability." Instead, to this day, Defendants falsely and repeatedly claim that Plaintiff was not subject to race and/or sex discrimination and retaliation by any of the Defendants or any members of the university community and that Plaintiff's claims should be dismissed.

The pattern of events detailed within the Amended Complaint (ECF No. 11) could have only happened upon a meeting of the minds to effectuate a common goal of punishing Plaintiff for her role in Defendant Elizabeth Katz's firing, and thus, a conspiracy among the Defendants to discriminate and retaliate against Plaintiff for complaining about race and/or sex discrimination and retaliation. This conspiracy **starts** with the refusal to correct racist and sexist discriminatory behavior such as tone policing and sexual harassment committed against Plaintiff by Defendants and members of the university community, continues with abuse of process and threats of suspension for complaining of race and/or sex discrimination and retaliation, escalates to defamation, fraud, and suspension, and **ends** with federal student loan theft, breach of contract, collections actions, and deactivation of Plaintiff's email account. Every act in the conspiracy was meant to discriminate or retaliate against Plaintiff, and hide Defendant WashU and their agents' discriminatory and retaliatory intent and actions towards Plaintiff.

Plaintiff alleges in her complaint that Defendants engaged in race and/or sex discrimination, and retaliated against her for complaining about the same. (Am. Compl,, ECF No. 11 at 1-153) Plaintiff also alleges that Defendants conspired to deny Plaintiff any relief from said race and/or sex discrimination and retaliation, and to this day, have conspired to deny Plaintiff any relief from the same. (Am. Compl. ECF No. 11 at 1-153) Plaintiff has submitted Exhibits in support of her conspiracy allegations, while Defendants have not submitted any exhibits to the contrary in their motion to dismiss. (*See also* Exhibit H) (ECF No. 19)

**It is significant that none of the Defendants have thus far denied the allegations of conspiracy nor their alleged roles therein.** Their declarations state solely that: 1) they do not conduct business or engage in business activities in the District of Columbia and 2) do not own property or pay taxes in Washington D.C. (Def.'s Mot. to Dismiss 1, ECF No. 19) Defendants

have not submitted any evidence contradicting Plaintiff's allegations and exhibits supporting the same. Therefore, Plaintiff's allegations regarding the conspiracy should be taken as true.

In the absence of a conspiracy, many actions committed against Plaintiff by Defendants and members of the university community would have been acknowledged and rectified. Further, the offenders would have been reprimanded including but not limited to the following:

1. Defendant Copeland's Failure to Investigate Richard O after Plaintiff's Complaint
2. Defendant Katz's Racist Behavior in the Classroom
3. Defendant Walsh's Deliberate Indifference to Multiple Gun Threats to Plaintiff
4. Defendants' Support of Richard O's Abuse of Process
5. Defendant Walsh's Failure to Furnish a Timely Letter of Good Standing
6. Defendant Davis' Defamatory Performance on November 2, 2022
7. Defendants' Interference with Plaintiff's DC internships
8. Defendants' Sham Student Conduct Board Hearing
9. Defendants Revoking Plaintiff's $37,000.00 Scholarship
10. Defendants Take Plaintiff's Full $10142 in Student Loans in Fall 2023
11. Defendants Sending Plaintiff Collection Notices for $40,294.00 owed to WashU
12. Defendants Disabling Plaintiff's Email Account allison.brown@wustl.edu

Though remedial actions would not repair Defendants' harm to Plaintiff, Defendants have not taken any. Defendants have not been reprimanded for their actions against Plaintiff. Instead, the discriminatory and/or retaliatory actions against Plaintiff are ignored, minimized, or encouraged, which allows for Defendants to continue to retaliate against Plaintiff without consequence. The list above is explained in more detail below, showing the conspiratorial actions

taken by Defendants to retaliate against Plaintiff because Plaintiff complained of race and/or sex discrimination and retaliation.

**1. Defendant Copeland's Failure to Investigate Richard O After Plaintiff's Complaint**

Richard O filed a Title IX Complaint against Plaintiff and Plaintiff counter-filed. Defendant Copeland mercilessly interviewed Plaintiff for several hours for weeks on end over the course of months (September 2021 to January 2022) and forced Plaintiff to produce hundred of pages of documents during her first semester of law school, which took significant amounts of time away from her coursework, and causing her exam performance to suffer. Plaintiff was also genuinely fearful for her safety attending class and going to work on WashU campus. Meanwhile Richard O, a male with a history of sexual assault allegations and who recently sent a rape contract to Plaintiff, was not investigated at all. This was a derelict response by any University and constitutes deliberate indifference. Plaintiff respectfully submits that Defendant Copeland was acting as part of a conspiracy to retaliate against Plaintiff for being a Black woman complaining about race and/or sex discrimination and retaliation as a valid explanation for Defendant Copeland's irrational behavior in minimizing Richard O's actions against Plaintiff and exaggerating Plaintiff's actions against Richard O so that the retaliation against Plaintiff was maximized. See also ECF No. 11; Count X - 20 U.S.C. § 1681 Title IX Claim.

**2. Defendant Katz's Racist Behavior in the Classroom**

Plaintiff complained of Defendant Katz' racist behavior to Defendants Angela Smith, Peggy Smith, and Elizabeth Walsh. A non-conspiratorial or rational university response would have investigated Plaintiff's complaints and Defendant Katz would have been advised to stop her

racist behavior in the classroom. In fact, Defendant Katz may well have kept her position at a non-conspiratorial and rational university if she stopped her racist behavior in the classroom.

In contrast, Defendant WashU did not acknowledge any wrongdoing by Defendant Katz, and actually encouraged Katz' racist behavior. (See Exhibit H) Defendants did nothing in accordance with its longstanding policy of ignoring women of color who complain of race and/or sex discrimination and retaliation. (Am. Compl. ECF No. 11 at ¶ 134.) Defendant Angela Smith and Defendant Walsh intentionally ignored Plaintiff. Defendant Peggy Smith even told Plaintiff that she would be expelled if she complained of racist or sexist behavior, but not antisemitism. Defendants WashU ignored Plaintiff's complaints, until four white students complained about Defendant Katz' racist behavior.

Plaintiff's four white friends posed a new challenge to WashU regarding complaints about Defendant Katz' racist behavior. In response to the complaints of these four white students, Defendant WashU dismissed Defendant Katz. Defendants WashU, Osgood, Katz, Walsh, Davis, Angela Smith, and Peggy Smith were upset by this dismissal but did not engage in any retaliatory actions against the white students. Instead, Defendants blamed Plaintiff for allegedly causing the white students to complain about Defendant Katz' racism and are retaliating against Plaintiff for the same. Plaintiff had no power regarding Defendant WashU's decision to fire Defendant Katz in response to the complaints of the four white students. Plaintiff could not control the complaints of the four white students, yet she was retaliated against for the same.

Defendants WashU and Osgood gave Defendant Katz a Civil Rights Award the following summer, presumably to counter and cover for Defendant WashU's firing her for her racially discriminatory behavior. While strange, Defendant Katz's oddly-timed award is not nearly as weird as Defendants Osgood, Walsh, Davis, Katz, Angela Smith, and Peggy Smith working

together to get Plaintiff expelled from WashU, and attempting to destroy Plaintiff's legal career.

**3. Defendant Walsh's Deliberate Indifference to Multiple Gun Threats to Plaintiff**

Plaintiff complained to Defendant Walsh that another male student, who is presently incarcerated for terroristic threats, was threatening her with a gun. In a non-conspiratorial and rational university, surely Plaintiff's complaint would have been investigated and the university would at least feign an appearance of trying to implement measures that would make Plaintiff safe.[1] In contrast, Defendant Walsh told Plaintiff "too bad, so sad." and to "make other friends." This is not non-conspiratorial nor rational behavior for licensed attorneys aware of their duties as administrators to address sex discrimination under Title IX. Plaintiff respectfully submits that Defendant Walsh responded in this manner as part of the conspiracy against Plaintiff because Plaintiff is a Black woman who engaged in protected activity.

**4. Defendant Walsh's Support of Richard O's Abuse of Process**

Richard O filed for a restraining order against Plaintiff by having her served by a police officer at her apartment in a St. Louis District Court, despite Plaintiff having no contact with him for 9 months. The Court date conflicted with Plaintiff's final Property exam, so Plaintiff contacted Defendant Walsh to reschedule her exam. Plaintiff asked Defendant Walsh if Richard O, another 1L, had rescheduled his exam because all 1L exams were scheduled for the same days. A non-conspirator administrator would likely tell Plaintiff after Plaintiff asked if Richard O rescheduled his exam so that Richard O could not commit abuse of process. Defendant Walsh said that she could not tell Plaintiff whether Richard O had rescheduled his exam. Plaintiff appeared in Court while Richard O did not. Richard O later gloated on social media that he had completed his exams while Plaintiff still had the rescheduled exam to take. Thus, Richard O

[1] Defendants Osgood, Copeland, Wendler-Modde, Katz, Walsh, Gore, Peggy Smith, and Angela Smith are all attorneys with various administrator and/or legal roles at Defendant WashU.

committed abuse of process against Plaintiff. Furthermore, Defendant WashU, Defendant Walsh, Richard O, and maybe others, including Defendant Copeland conspired to have Plaintiff appear in Court knowing that Richard O had no intention of doing the same, aiding Richard O in committing the intentional tort of abuse of process against Plaintiff. Defendant Walsh's conspiratorial actions were essential because if she told Plaintiff that Richard O did not reschedule his exam, Plaintiff would not have rescheduled her exam. This conspiratorial action was committed against Plaintiff is Black and engaged in protected activity.

**5. Defendant Walsh's Failure to Furnish a Timely Letter of Good Standing**

A logical solution to Defendant WashU's problem with Plaintiff complaining of race and/or sex discrimination and retaliation would have been to allow Plaintiff to transfer to another university in Summer 2022, **which was the only time Plaintiff unilaterally tried to transfer to another university.** If Plaintiff transferred, Defendant WashU would no longer have to hear Plaintiff's complaints of race and/or sex discrimination and retaliation. Yet, Defendants WashU, Osgood, Walsh, Angela Smith, Peggy Smith, Katz and Davis refused to send a timely letter of good standing to GULC or Columbia. Why? Plaintiff respectfully submits Defendants and the University Community did not support Plaintiff's application to transfer to another university after her first year because they wanted to continue to discriminate, punish, and retaliate against Plaintiff because she complained of race and/or sex discrimination and retaliation.

**6. Defendant Davis' Defamatory November 2, 2022 Performance**

On November 2, 2022, Plaintiff said in Professor Davis' classroom, "the classroom is the safest place to talk about linguistic racism." In response, Professor Davis started crying, called herself "the KKK" and "Bull Connor," said she "was going to the Dean's Office to get the class the [Professor] they deserved," and cancelled class for the following week on November 2, 2022.

Two days later, on November 4, 2022, Plaintiff was suspended and branded a "threat" to the university community by Defendant Wild. Shortly thereafter, Plaintiff's mother sent to Defendant Walsh and Defendant Wild a series of handwritten letters containing Defendant Davis's emails supporting the fact that Professor Davis feigned objection to Plaintiff's innocuous comment in order to get her suspended. (Exhibit L of Am. Compl. ECF No. 11)

In any non-conspiratorial, rational university, the November 2, 2022 Defendant Davis classroom tape would have been reviewed by Defendant WashU, Plaintiff would have been exonerated, and Professor Davis would be disciplined. Instead, Defendant WashU engaged in what could only be explained as a retaliatory conspiracy to do everything that it possibly could to vilify Plaintiff and protect Defendant Davis because Plaintiff complained of race and/or sex discrimination and retaliation.

The multitude of retaliatory acts against Plaintiff include but are not limited to: 1) Defendant WashU, Walsh, Gore, Hudson, Wendell-Modde, and Osgood's refusal to allow anyone to see the November 2, 2022 classroom tape, which would exonerate Plaintiff, 2) Defendant Wild threatening Plaintiff with arrest if she stepped foot on WashU campus or participated in any WashU related activities, **on or off campus**, 3) Defendants Osgood, Wild and Walsh suspending plaintiff, 4) Defendant Kamimura-Jimenez's failure to do anything in his capacity to help Plaintiff, 5) Defendants Osgood, Walsh, Wild, Gore, Wendell-Modde, Hudson, Angela Smith, and Peggy Smith subjecting Plaintiff to a multi-day for several hours sham Student Conduct Board proceeding even after Defendants Davis and Katz were removed as witnesses against Plaintiff, 6) Defendant Walsh, Wild, Gore, Hudson, Wendell-Modde and Osgood forcing Plaintiff to attend GULC for her final year of law school, 7) Defendants Osgood, Wild and Walsh suspending plaintiff, 8) Defendant Walsh interfering with Plaintiff's internships in Washington

D.C. during her second year of law school, 9) Defendants WashU, Osgood, Walsh, and Burns revoking Plaintiff's $37,000.00 scholarship as a full time WashU student visiting GULC after WashU demanded that she attend GULC, 10) Defendant WashU and Burns threatening Plaintiff with collections, alleging Plaintiff owed Defendant WashU $40,294.00 and 11) Defendant WashU disabling her email account, allison.brown@wustl.edu. In contrast, Defendant Davis received a Civil Rights Award shortly after the conclusion of the Student Conduct Board Hearing and was given the honor of being Commencement Speaker for Plaintiff's graduation.

**7. Defendants' Interferences with Plaintiff's D.C. Internships**

Shortly after Defendants knew that Defendant Davis had feigned objection to Plaintiff's innocuous comment, Plaintiff obtained several internships with D.C. entities. In a non-conspiratorial, rational university, Plaintiff would be allowed to participate in these D.C. internships and restored to "good standing" once Defendants knew that Defendant Davis had feigned objection to Plaintiff's innocuous comment. In reality, however, Defendants WashU and Walsh did not allow Plaintiff to participate in internships in Washington D.C. during her second year of law school and kept her status as "not in good standing." Why? Plaintiff respectfully submits that Defendants WashU and Walsh kept Plaintiff's status as "not in good standing" and refused to allow her to participate in D.C. internships as part of a retaliatory conspiracy for Plaintiff complaining about race and/or sex discrimination and retaliation. (ECF No. 11)

**8. Defendants' Sham Student Conduct Board Hearing**

Defendant Walsh, Wild, Gore, Hudson, Wendell-Modde, and Osgood forced Plaintiff to undergo a sham Student Conduct Board hearing led by Defendant Hudson where Defendants Peggy Smith and Angela Smith, two women of color, and three white men, all testified that

Plaintiff should not complain about race and/or sex discrimination or retaliation, a legally protected activity. Plaintiff was living in Maryland during the entirety of this proceeding. In a non-conspiratorial, rational university, Plaintiff would not have been subjected to a Student Conduct Board hearing for complaining about race and/or sex discrimination and retaliation. Why did the Defendants do this? Plaintiff respectfully submits that Defendants forced Plaintiff to undergo a sham Student Conduct Board hearing as part of a retaliatory conspiracy to punish Plaintiff for complaining of race and/or sex discrimination and retaliation. Defendants WashU, Osgood, Walsh, Wild, Gore, and Wendell-Modde retaliated against Plaintiff by claiming that Plaintiff was a threat and harassing the University community in violation of Sections 2 and 4 of the University Conduct Code when in fact Plaintiff was merely engaging in protected activity by complaining of race and/or sex discrimination and retaliation. (ECF No. 11 ¶¶ 72, 76, 257-357)

**9. Defendants Revoking Plaintiff's $37,000.00 Annual Scholarship**

In accordance with Defendant WashU, Gore, Wendell-Modde, Wild, Walsh, Davis, Peggy Smith, and Hudson's demand that Plaintiff leave WashU and attend GULC, Plaintiff matriculated to GULC as a visiting student for her 3rd year as a full time student at WashU. A non-conspiratorial university would have granted Plaintiff her scholarship, as Defendant WashU, Osgood, Walsh, and Burns initially did in July 2023. (Exhibit B) In August 2023, Defendants WashU, Osgood, Walsh, Burns revoked Plaintiff's scholarship. Why? Plaintiff respectfully submits that Defendants revoked Plaintiff's scholarship in a retaliatory conspiracy because Plaintiff complained of race and/or sex discrimination and retaliation.

**10. Defendants Steal Plaintiff's Full $10,142.00 in Student Loans in Fall 2023**

Defendants WashU, Osgood, Walsh and Burns stole $10,142.00 ($10,250 - $108) in Student Loans from 2023-2024 from Plaintiff. During Fall 2023, Defendant WashU received

$17,455.02 in cash and $10,142.00 in student loans from Plaintiff, or $27,597.02. Adding on Plaintiff's $18,500 per semester scholarship, Plaintiff should have been credited for $46,097.02 in payments to Defendant WashU for Plaintiff's Fall 2023 semester. This far exceeds GULC's $37,975 per semester tuition under the Consortium Agreement and $2,500 WashU health insurance bill. Plaintiff should have been refunded $5,622.02. Why did Defendants WashU, Osgood, Walsh and Burns steal all of Plaintiff's student loans? Plaintiff respectfully submits that the Defendant's stole Plaintiff's loans in Fall 2023 as part of a retaliatory conspiracy because Plaintiff complained of race and/or sex discrimination and retaliation.

**11. Defendant Sending Plaintiff Collection Notices for $40,294.00 Owed to WashU**

A contractual provision that "the contract is to be performed, in whole or in part, in D.C." is usually sufficient to create "a substantial connection between the contract and the forum." *Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 7 (D.D.C. 2009)

Defendants WashU, Osgood, Walsh and Burns have sent Plaintiff numerous collection notices and Plaintiff's Account shows a balance outstanding of $40,294.00 in connection with the Consortium Agreement to be performed in Washington D.C. Why? Defendant WashU received $20,284.00 in student loans, $17,455.02 in cash and Plaintiff had a $37,000.00 scholarship contingent only upon Plaintiff maintaining full time status, which she did. Thus, Plaintiff should have been credited for paying WashU $74,739.02. If Plaintiff paid WashU an additional $40,294.00, WashU would receive $115,033.02 in cash and scholarships, far exceeding the $75,950.00 due to GULC under the Consortium Agreement and $2,500.00 for health insurance. Why would Defendant WashU claim that Plaintiff owes such an excessive amount? Well, Defendants claim that WashU has "authority to take disciplinary action or modify scholarship awards." (ECF 19, Defendants' Motion to Dismiss at 30) Plaintiff respectfully

submits that WashU does not have the authority to fraudulently take disciplinary action, modify scholarship awards, and/or charge excess tuition because Plaintiff complained of race and/or sex discrimination or retaliation. Defendant WashU, Osgood, Walsh, and Burn's claim that Plaintiff owes Defendant WashU $40,294.00 pursuant to the Consortium Agreement retaliatory conspiracy against Plaintiff because Plaintiff engaged in protected activity. (Exhibit B.)

**12. Defendant's Disabling Plaintiff's Email Account (allison.brown@wustl.edu)**

Around June 1, 2026, Defendant WashU disabled Plaintiff's email account. Why? Plaintiff respectfully submits that Defendant disabled Plaintiff's email account because Plaintiff complained of race and/or sex discrimination and retaliation.

Assuming as true the unchallenged allegations of conspiracy and the multiple overt acts in the District of Columbia in furtherance of the conspiracy, there is no injustice in requiring the Florida, Massachusetts, Michigan, and remaining Missouri Defendants to submit to suit here. All of the Individual Defendants took at least one overt act which furthered the conspiracy to punish Plaintiff for her complaints of race and/or sex discrimination and retaliation, which allegedly made 4 white students file complaints that caused WashU to fire Defendant Katz. Thus, Defendants all played their individual roles which furthered the conspiracy against Plaintiff across state borders and into Washington D.C., where Defendants architected a contract where they would once-and-for-all force Plaintiff into destitution. **All of the actions Defendants committed against Plaintiff were done for one conspiratorial purpose: to punish, discriminate and retaliate against Plaintiff for her complaints of race and/or sex discrimination and retaliation, first in Missouri, then in Maryland, and now finally in Washington D.C. This Court has jurisdiction over all Defendants.**

## III. MISSOURI MAY NOT HAVE JURISDICTION OVER DEFENDANTS OSGOOD, HUDSON, AND KATZ BECAUSE THEY ARE NOT MISSOURI RESIDENTS AND MANY ACTIONS TOOK PLACE OUTSIDE OF MISSOURI

The Missouri's Long Arm Statute, Section 506.500 RSMo, states,

> 1. Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:
>
> (1) The transaction of any business within this state;
>
> (2) The making of any contract within this state;
>
> (3) The commission of a tortious act within this state;
>
> (4) The ownership, use, or possession of any real estate situated in this state;
>
> (5) The contracting to insure any person, property or risk located within this state at the time of contracting; …
>
> 3. Only causes of action arising from acts enumerated in this section may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.

**Unlike the District of Columbia long-arm statute, Missouri's long-arm statute requires an out-of-state Defendant's actions to occur "within the state" to be subject to jurisdiction in Missouri.** Defendant Katz is a resident of Florida, Defendant Hudson is a resident of Michigan, and Defendant Osgood is a resident of Massachusetts. Plaintiff moved to Maryland shortly after her November 2, 2022 suspension. Thus, Plaintiff resided in Maryland for the end of her 1st semester of her 2nd year and the last 3 semesters of law school. Plaintiff now resides in Washington D.C. - where Defendants are looking to collect $40,294.00 from Plaintiff.

Many of the Defendants discriminatory and retaliatory actions arguably did not occur "within the state" of Missouri because Plaintiff was not in Missouri when:

1. Defendants failed to provide a timely letter of good standing to facilitate Plaintiff's transfer after her 1st year

2. Defendants forced Plaintiff to attend GULC in Washington D.C. for her 3rd year
3. During the entirety of the sham Student Conduct Board Hearing
4. Defendants' banned Plaintiff from any **on or off campus** WashU related activities
5. Defendants' failed to provide up to 30% of the tapes for the online classes
6. Defendants' interfered with Plaintiff's D.C. internships
7. Defendants' revoked Plaintiff's scholarship pursuant to the Consortium Agreement,
8. Defendants' demanded that Plaintiff pay GULC directly
9. Defendants' stole all $20,500.00 of Plaintiff's student loans
10. Defendants' put Plaintiffs' account into collections for owing $40,294.00
11. Defendants' disabled Plaintiff's email account (Plaintiff was a DC resident at the time her email account was disabled and now lives and works in DC.)

Further, Plaintiff may lose her right to bring her claims against Defendants Katz, Hudson and Osgood for actions occurring while Plaintiff was not "within the state" of Missouri because they are no longer Missouri residents. In contrast, the District of Columbia's long-arm statute and conspiracy theories of jurisdiction provide Plaintiff fundamental fairness and due process to be able to bring all of her claims against all of the Defendants. Thus, the District of Columbia is the *only* appropriate jurisdictional forum for Plaintiff's claims. Accordingly, the law of the District of Columbia should apply, not the law of Missouri.

**IV. WASHINGTON D.C. IS THE PROPER VENUE FOR PLAINTIFF'S COMPLAINT**

28 U.S.C. § 1391(b) states: "Venue is proper in the district where (1) any defendant resides if all defendants reside in the same state; (2) a substantial part of the events giving rise to the suit occurred; or (3) if venue would not be proper in any district for those reasons, wherever the defendants are subject to personal jurisdiction."

Section 1 is inapplicable because the Defendants do not reside in the same state. That is, Defendant WashU is a resident of both Washington D.C. and Missouri, Defendant Osgood is a resident of Massachusetts, Defendant Hudson is a resident of Michigan, and Defendant Katz is a resident of Florida. Only the remaining Defendants reside in Missouri. (See ECF 19)

Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred within Washington D.C. including but not limited to Defendants': "1) failure to provide a timely letter of good standing to GULC to support Plaintiff's one and only unilateral transfer application to GULC after Plaintiff's 1st year, 2) interference with Plaintiff's internships and fellowships in Washington D.C. during Plaintiff's 2nd year and 3rd year of law school 3) forcing Plaintiff to attend GULC from 2023-2024, 4) revocation of Plaintiff's scholarship in Plaintiff's 3rd year pursuant to the Consortium Agreement, 5) breach of the Consortium Agreement by Defendants refusing to pay GULC tuition, 6) demanding that Plaintiff pay GULC tuition despite Plaintiff paying Defendant $17,055.42 cash and 7) stealing all $20,500 of Plaintiff's FAFSA student loan funds (which were acquired solely for expenses incurred during Plaintiff 's 3rd year attendance at GULC), leaving Plaintiff abjectly impoverished and destitute while attending GULC for Plaintiff's 3rd year of law school." ECF No. 11. Defendants are now seeking $40,294 from Plaintiff. Around June 1, 2026, Defendant WashU disabled Plaintiff's e-mail account while Plaintiff was living in Washington D.C. Plaintiff now lives and works in Washington D.C.

Even if this court finds that venue would not be proper under 28 U.S.C. § 1391(b) (1) and (2), Venue is proper because all of the Defendants are subject to personal jurisdiction in Washington D.C. See Section II above.

## V. PLAINTIFF HAS PROPERLY PLED CLAIMS AGAINST ALL DEFENDANTS

A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974). Plaintiff respectfully submits that she has properly pled and is entitled to redress on each of the following claims.

### A. Count I – Title VII

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee . . . because [s]he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). To make out a prima facie case of retaliation under Title VII, a plaintiff must show "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by h[er] employer; and (3) that a causal link connects the two." *Jones v. Bernanke,* 557 F.3d 670, 677 (D.C. Cir. 2009) (citation omitted). "A plaintiff need not plead each element of a prima facie retaliation case to survive a motion to dismiss, but she must allege facts that, if true, would support such a claim."*Rattigan v. Gonzales,* 503 F. Supp. 2d 56, 71-72 (D.D.C. 2007)

"[A]t this early stage of the proceedings, [the] plaintiff can meet her prima facie burden of causation simply by alleging that the adverse actions were caused by her protected activity." *Bryant v. Pepco*, 730 F. Supp. 2d 25, 31-32 (D.D.C. 2010). See *Hoskins v. Howard Univ.*, 839 F. Supp. 2d 268 (2012) (Court concluded that plaintiff adequately stated a retaliation claim under Title VII by asserting that she engaged in protected activity by filing a formal complaint with Howard's EEO Office, and that in response to the complaint, Howard retaliated against her by

subjecting her to materially adverse actions). Plaintiff's facts are more analogous to *Hoskins v. Howard Univ.*, 839 F. Supp. 2d 268 (2012) than Defendants' Title VII offerings.

Plaintiff received a right to sue letter from the EEOC on August 29, 2026 which was served on Defendant WashU's registered agent's address in Washington D.C. on the same day. Plaintiff was an employee of Defendant WashU and received a W-2 for her work as a research assistant for Defendant Davis. See Exhibit E and Exhibit F attached to this filing.

Both Plaintiff and 4 white students complained about the same racist classroom behavior of Defendant Katz. Plaintiff made a complaint to Defendant Copeland regarding sex discrimination. Plaintiff's complaints were labeled as threats and harassing to the University Community. The four white students' Complaint was deemed legitimate and Defendant Katz was dismissed. In contrast, Plaintiff was forced by Defendants to leave WashU. None of the 4 white students were forced to leave WashU by Defendants. Plaintiff was forced to leave because she is Black. Thus, Plaintiff has shown that she suffered a discriminatory transfer in violation of Title VII. *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (forcing a transfer based on a protected characteristic inherently discriminates regarding the "terms, conditions, or privileges" of employment under Title VII, no proof of tangible physical or economic harm required).

Defendants continue to commit discriminatory and retaliatory acts against Plaintiff to this day. Defendants are still seeking an excessive $40,294.00 from Plaintiff. They have never denied this fact, and their internal records reflect the same. (Exhibit B, Exhibit C) Furthermore, around June 1, 2026, Defendants disabled plaintiff's email account, allison.brown@wustl.edu. Defendants have not disabled non-complaining white students' email accounts. Thus, Defendants discriminatory and retaliatory actions are recent. The 180 day count runs from the last retaliatory act. Thus, Plaintiff's claims are timely.

**B. Count II – Section 601 of Title VI**

Title VI of the Civil Rights Act of 1964 prohibits discrimination in federally assisted programs. Section 601 of Title VI provides that:

> "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d (1988).

Plaintiff suffered "disparate treatment" and was treated differently from her white classmates because she is Black and engaged in protected activity. Defendant WashU forced her to finish her final year of law school at GULC while her white classmates were allowed to finish their final year at WashU. Further, Plaintiff clearly stated in her Amended Complaint that Defendant WashU and the Individual Defendants intentionally discriminated against Plaintiff because she is Black. Defendants treated Plaintiff's complaints of race and/or sex discrimination and retaliation as a "pattern of disruptive and harassing behavior targeted at law school community members, including faculty and students." (Def.'s Mot. to Dismiss at 33, ECF No. 19.) See also Section II. D. on the irrational intentionality in Defendants' conspiratorial actions. Therefore, this Court should not grant Defendants' Motion to Dismiss Plaintiff's Title VI claim.

**C. COUNT III – 42 U.S.C. § 1981**

"To state a claim for racial discrimination under Section 1981, the plaintiff must allege that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate against the plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 91 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020). Further, in *Banks v. Chesapeake & Potomac Telephone Co.*, 802 F.2d 1416 (D.C. Cir. 1986), the Court held that § 1981 provide[s] remedies for a broad range

of actions that could be characterized as various state torts. Further, “Section 1981’s text covers private acts that deny a person the benefit of security or property because of that person's race.” *Id*.

In *Goodman v. Lukens Steel Co.*, the Supreme Court observed that Section 1981's prohibition on race discrimination in contracting "is part of a federal law barring race discrimination, which . . . is a fundamental injury to the individual rights of a person." 482 U.S. 656, 661 (1987). Claims under Section 1981, the Court concluded, "are in essence claims for personal injury." *Id.* (making that statement as to section 1983 claims and later stating that its "characterization of § 1983 claims is thus equally appropriate" to section 1981 claims). *Id*. “The same can be said about Title IX. It is part of a constellation of federal laws barring gender discrimination.” *Smith v. Howard Univ.*, 605 F. Supp. 3d 103 (D.D.C. 2022). Defendant WashU breached at least 3 contracts in retaliation against Plaintiff because Plaintiff is a Black woman who complained of race and/or sex discrimination and retaliation. If Plaintiff were not Black, Defendants would not have discriminated against and retaliated against her. Plaintiff’s race, Black, was the “but for” cause of Defendants’ race and/or sex discrimination and retaliation.

First, Defendants WashU breached the contract between Plaintiff and WashU where Plaintiff agreed to attend WashU as a full-time student and was given a $37,000.00 annual scholarship with the only condition that Defendant remain a full-time student. Defendant WashU breached this contract when it revoked her scholarship while Plaintiff remained a full-time student at WashU. Plaintiff was cleared of any wrongdoing and Defendant had no grounds to revoke Plaintiff’s scholarship. Nonetheless, Defendant retaliated against Plaintiff and revoked Plaintiff’s scholarship because she is Black and complained of race and/or sex discrimination and retaliation. (See also <u>Exhibit K</u> of Am. Compl. ECF No. 11 ¶¶ 289 - 335.)

Second, Defendants WashU subcontracted its responsibility to provide educational services to Plaintiff during Plaintiff's 3rd year of law school to GULC through the Consortium Agreement. Plaintiff and breached the Consortium Agreement by not paying the tuition due because Plaintiff was Black and complained of race and/or sex discrimination and retaliation. Please see also Items 9-11 in Section II.D. of this memorandum.

Third, Defendants WashU, Osgood, Davis, Walsh, Peggy Smith, Angela Smith conspired to retaliate against Plaintiff by having Defendant Davis claim that Plaintiff's presence was a threat to the WashU community. But they had one problem: Plaintiff would not speak. After 2 weeks of trying to get Plaintiff to say anything so that Defendant Davis could label her as a threat to the WashU community, Defendant Davis was desperate. There were only a few more classes until the semester ended. When Plaintiff finally did speak, she said "the classroom is the safest place to discuss linguistic racism." Defendant Davis pounced on Plaintiff's innocuous comment; Defendant Davis cried, she threw down the microphone, she called herself the KKK and Bull Connor, she ran to the Dean's office "to get the class the [Professor] they deserved," and she cancelled classes the following week. There were two evidentiary problems with this suspension: 1) an email from Defendant Davis to Plaintiff first admonishing Plaintiff for not raising her hand before speaking in class followed by an email with suspect preoccupation over whether Plaintiff had raised her hand in a class of over 90 students (Defendant Davis' attempt to create an issue that wasn't real), and 2) a tape recording showing the bizarre response of Defendant Davis' reaction to Plaintiff's innocuous comment.

If Plaintiff was not Black, Defendants would have recognized that if Plaintiff was truly a threat to the University community, there would be no need for Defendant Davis to feign objection to get Plaintiff suspended. Defendants' retaliation against Plaintiff was very irrational,

yet very intentional and Plaintiff's race was the "but for" cause of Defendants' discriminatory and retaliatory actions. Please see Am. Compl. (ECF No. 11) ¶¶ 409-415.

Far more than four white students, including David S, Kay G, Emma W, and Dinora O also complained of the same race discrimination that Plaintiff did. The white students were not told to stop complaining about race discrimination. There were many white students in Plaintiff's 1L cohort who complained of Katz's racism. These white students were not ignored, as Defendant Katz was fired due to their claims. These white students did not have a Professor feigning objection to an innocuous comment to provide fraudulent evidence that they were a threat. These white students were not labeled as threats or harassing the University Community. These white students did not appear before the disproportionately Black sham Student Conduct Board for being threats or harassing the University Community. These white students were not forced to leave WashU. The white students were not stripped of their scholarships. These white students were not charged excessive amounts of tuition. These white students' WashU email accounts were not disabled. Again, Plaintiff's Black race was the "but for" cause of Defendants' race and/or sex discrimination and retaliation against Plaintiff. If Plaintiff was white, Defendants would not have discriminated and retaliated against her. If Plaintiff was white, Defendants' Osgood, Wild, Walsh, Davis, Hudson, Copeland, Wendell-Modde, Gore, Peggy Smith, Angela Smith, Burns, and Katz, would have been disciplined for discriminating and retaliating against Plaintiff and Defendant Kamamura-Jimenez would have helped Plaintiff. A cursory view of Plaintiff's white counterparts and where they are today on LinkedIn- which include the Biglaw firms of Sidley Austin, Freshfields, and Cravath, Swaine, and Moore - is evidence of Defendants' disparate treatment of Plaintiff - as Plaintiff has had significant difficulty finding a job ever since she was not offered a return offer at the BigLaw firm where Plaintiff was told she

was "the most professional summer associate" in her class by the Director of HR at Norton Rose Fulbright in New York because of Defendant WashU's suspension of Plaintiff for six months and subsequent defamation of her character as "ghetto" and "aggressive" to potential employers including those at the D.C. Bar Association, D.C. Office of Human Rights, the Street Law Fellowship at GULC, and the National Center for Youth Law as late as April 2026.

Defendants know this and would never discriminate or retaliate against a white person in the same way they discriminated and retaliated against Plaintiff. Thus, Plaintiff has satisfied the requirements to state a claim under Section 1981 for race discrimination because "but for" her being Black, Defendants would not have discriminated and retaliated against her. *Comcast Corp. v. Nat'l Assoc. of African-American Owned Media*, 589 U.S. 327 (2020) (plaintiff suing for racial discrimination under 42 U.S.C. Section 1981 must prove that race was the "but for" cause of the injury from the beginning to the end of the lawsuit.)

**D. Count IV - Fraud and Unjust Enrichment**

Constructive fraud, like fraudulent concealment, requires that the defendant make a false representation in reference to a material fact with knowledge of its falsity. *See Himmelstein v. Comcast of the Dist., LLC*, 908 F. Supp. 2d 49, 59 (D.D.C. 2012).

Fraudulent misrepresentation requires: "(1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) and with intent to deceive, (5) with action taken in reliance upon the representation." *Nader v. Allegheny Airlines, Inc.*, 512 F.2d 527, 541 n. 32 (D.C. Cir. 1975).

First, Defendants told Plaintiff that the $37,000.00 scholarship Defendant WashU awarded to her each year was contingent solely on her maintaining full time status. Plaintiff relied on this representation and decided to attend WashU because with the $37,000.00

scholarship, it was much less expensive than most other Top 14 law schools. Defendant WashU intended to deceive Plaintiff by making the $37,000.00 not solely contingent on her maintaining full time status. Apparently Defendants' $37,000.00 scholarship could be taken away simply by a Professor feigning objection to an innocous comment in accordance with a University wide conspiracy to discriminate and retaliate against Plaintiff because she complained of race and/or sex discrimination and retaliation. If Plaintiff had known that the $37,000.00 scholarship could be taken away due to the fraudulent actions of members of the University community, Plaintiff would not have attended WashU. Please see <u>Exhibit A</u> of this filing, and <u>Exhibit M</u> of Am. Compl. ECF No. 11 ¶¶ 20, 25, 34, 43, 80, 88, 98-101, 192, 316, 338-357, 365, 374, 396, 419-420, 426, 434-439, 442, 445, 460-480, 483-484, 496, 512-513.

**E. Count V – Intentional Infliction of Emotional Distress**

Under District of Columbia common law, intentional infliction of emotional distress consists of (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress. Intent or recklessness can be inferred from the outrageousness of the acts. The conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society . . . . The ultimate question is whether the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim "Outrageous!" *Purcell v. Thomas*, 928 A.2d 699, 711 (D.C. 2007) (internal quotation marks, alterations, and citations omitted).

In *Hoskins v. Howard Univ.*, 839 F. Supp. 2d 268 (2012), the Court held that "Although both parties inexplicably fail to raise this point in their briefs, the District of Columbia Court of Appeals has long declared that the "'[c]reation of a hostile work environment by racial or sexual

harassment may, upon sufficient evidence, constitute a prima facie case of intentional infliction of emotional distress.'" *Id. at 282-283 citing Howard Univ. v. Best,* 484 A.2d 958, 986 (D.C. 1984) "Sexual harassment . . . may include misconduct by a co-employee that is independently actionable under the common law, such as battery or intentional infliction of emotional distress." (internal quotation marks and citation omitted). "In such a case, the conduct is actionable at common law under an emotional distress theory . . . because the blatant and repeated instances of inappropriate conduct have risen to such a level that they may properly be regarded as extreme and outrageous." *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 577 (D.C. 2007). As detailed above in the context of the plaintiff's hostile work environment claim, the Plaintiff has alleged "blatant and repeated instances of inappropriate" conduct by Webb that the Court finds could, at the Rule 12(b)(6) stage, "properly be regarded as extreme and outrageous." *Hoskins v. Howard Univ.*, 839 F. Supp. 2d 268 (2012) Plaintiff respectfully asks this Court to find the same of Defendants' actions.

Further, Plaintiff has an instagram account, @honeynewten, that grew from 2000 followers to over 30,000 immediately after Plaintiff posted tape recordings of Defendants' sham hearing online in August 2025. The tape recording of Defendant Wild suspending Plaintiff itself has over 1 million views and over 56,000 likes. (Exhibit J) The tape recording of Defendant Walsh telling Plaintiff during the Student Conduct Board hearing that Plaintiff had no right to complain about being ostracized because of her complaints of race and/or sex discrimination and treated differently than her white, similarly situated classmate, Yehoshua W, has over 1.5 million views. (Exhibit J) The tape recording of Defendant Walsh attempting to coach one of Plaintiff's white classmates and witnesses during the Student Conduct Board hearing to say that Plaintiff violated the Student Conduct Code has 2.1 million views, and over 78,000 likes. (Exhibit J)

Plaintiff's repeated capture through tape recordings of Defendants' actions have more views than people who live in Washington D.C. and St. Louis combined - because they are outrageous.

Plaintiff also has thousands of comments on her profile remarking on Defendant WashU's racist, sexist, and retaliatory conspiracy, which is properly regarded by the public as extreme and outrageous. (Exhibit J) In fact, thousands of comments read with some iteration of "This is crazy." "Insane." or "I am so sorry this is happening to you. This is horrible." Thus, Defendants' actions through their conspiracy easily meets the threshold of "extreme" and "outrageous" conduct - because the public has watched it for themselves, and agreed with Plaintiff that their actions constitute intentional infliction of emotional distress. Thus, this claim should not be dismissed.

### F. Count VI – Negligence

"Negligence is a word of broad significance and may not readily be defined with accuracy. Courts usually refrain from attempts comprehensively to state its meaning. While liability arises when one suffers injury as the result of any breach of duty owed him by another chargeable with knowledge of the probable result of his conduct. . . Some courts call willful misconduct evincing intention or willingness to cause injury to another gross negligence."

*Slaughter v. Atlantic C. L. R. Co.*, 302 F.2d 912, 914-915 (1962)

Defendants' conduct as described in this filing and the Amended Complaint, ECF 11, was willful, egregious and reckless and easily satisfy negligence, along with the requirements for all of the other counts. While Defendants' actions are egregious, they also meet the minimal requirements of negligence. To follow are some but not all of Defendants' acts that amount at least to negligence: Defendant Elizabeth Walsh, as the Dean of Student Life at Defendant WashU Law School, failure to transmit a letter of good standing to GULC; Defendant Kamimura-Jimenez's failure to end Defendant WashU's torture of Plaintiff after hearing about Defendant Davis's racist chicanery; and Defendant Copeland torture of Plaintiff for months on

end and her subsequent failure to investigate Richard O, a known sexual predator, when he was trying to contract his way out of sexual assault and rape against Plaintiff. (Am. Comp. ECF 11; Exhibit D, Exhibit E) Thus, Plaintiff's negligence claim should not be dismissed.

**G. Count VII – Breach of Contract**

In the absence of an express term to the contrary, the usual practices surrounding a contractual relationship can become the contractual obligation. *Bason v. American University*, 414 A.2d 522, 525 (D.C. 1980); *Pride v. Howard University*, 384 A.2d 31, 35 (D.C. 1978). Thus, the issue of whether a party knew or had reason to know of a usage would present a question of fact for the jury. *1901 Wyoming Avenue Cooperative Ass'n v. Lee*, 345 A.2d 456, 461-62 & n.11 (D.C. 1975).

In construing contracts of employment in a university setting, we follow the instruction that such employment contracts "comprehend as essential parts of themselves the hiring policies and practices of the University as embodied in its employment regulations and customs." *Greene v. Howard University*, 412 F.2d 1128, 1135 (1969).

> Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is. The readings of the market place are not invariably apt in this non-commercial context.

*Id.* As noted by this court, in the absence of an express term to the contrary, the usual practices surrounding a contractual relationship can become the contractual obligation. *Bason v. American University*, 414 A.2d 522, 525 (D.C. 1980); *Pride v. Howard University*, 384 A.2d 31, 35 (D.C. 1978). Plaintiff was never an independent contractor - she received a W2, and Defendants should be sanctioned for lying about that. (Exhibit F) Plaintiff would have had no reason to know why Defendants maintain that she owes Defendant WashU $40,294.00, nor why her scholarship was revoked after Defendants demanded that Plaintiff leave WashU. The only

reasonable explanation is that Defendants did so to punish Plaintiff for engaging in protected activity. Please see Am. Compl. ECF No. 11 ¶¶ 458-484.

**H. Count VIII – Defamation**

To state a cause of action for defamation, a plaintiff must allege four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm. *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005).

Plaintiff included every paragraph in the Complaint as support for her defamation claim. Am. Compl. ¶¶ 485-486. Yet, Defendants assert that Plaintiff did not state her claims of defamation sufficiently. Plaintiff's claim should not be dismissed; see Am. Compl. ¶¶ 35, 50-54, 153-158, 225, 240-241, 257, 286, 302, 310-314, 370, 395, 419, 480, 485-506, and 511-513.

**I. Count IX – 42 U.S.C. § 1985 Conspiracy to Interfere with Civil Rights**

Establishment of an actionable conspiracy under § 1985 requires that a plaintiff must allege and prove four elements: 1) a conspiracy; 2) for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Hobson v. Wilson*, 737 F.2d 1, 14 (1984).

Plaintiff hereby re-alleges and re-incorporates all conspiratorial claims that have been pled within this filing and ECF No. 11, the Amended Complaint, and including but not limited to Section II.D. of this filing. At all times material hereto, Defendants at times acted in concert with

each other and by authorized agents, servants, workmen, and/or employees acting within the course and of employment with Defendants and in furtherance of a conspiracy to commit discrimination under Section 1985 and all other claims in ECF No. 11. ¶¶ 493-506.

**J. Count X - 20 U.S.C. § 1681 Title IX Claims**

The Supreme Court has recognized an implied private right of action to enforce Title IX. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-81 (1998) (describing the development of the implied private right of action). In *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999), the Supreme Court held that a university "may be liable for damages under Title IX . . . for discrimination in the form of student-on-student harassment," *id.* at 639. The governing test, however, is not easily met. First, a university "may be liable in damages under Title IX only for its own misconduct," *Id.* at 640, and thus, the plaintiff must show that the university had "actual knowledge" of the "sexual harassment" or discrimination, *id.* at 650. Second, the plaintiff must show that the university "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]." *Id.* at 645. Third, the sexual harassment complained of must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650. Fourth, mere negligence is not enough; the plaintiff must demonstrate that the university was "deliberately indifferent to sexual harassment." *Id.* Finally, when the university has "not engage[d] in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment." *Id.* at 644. "That is," the university's "deliberate indifference must, at a minimum, 'cause to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 645 (citations omitted).

A court may find that a university was "deliberately indifferent" only if its response or failure to respond "to the harassment . . . is clearly unreasonable in light of the known circumstances." *Id.* The deliberate-indifference inquiry must also take into account "both . . . the level of disciplinary authority available to the school" and "the potential liability arising from certain forms of disciplinary action." *Id.* at 649. *Cavalier v. Catholic Univ. of Am*., 513 F. Supp. 3d 30 (2021)

Defendant argues that Defendant Copeland conducted an extensive investigation into her complaint against Richard O before dismissing the same. Def.'s Mot. to Dismiss 34, ECF No. 19. Defendant Copeland addresses the rape contract as "a text sent by the Respondent containing a proposed promise of physical affection and sexual activity" and that the documentation does not "demonstrate any threats or other attempts to have you agree to or abide by this promise. This does not rise to the level of a threat of physical abuse." (Exhibit H of Am. Compl., ECF No. 11) That is not what Richard O's texts were. A contract cannot override the legal right to stop sexual activity at any given time. Criminal law does not allow for advance or irrevocable agreements for sexual activity. Thus, this was a threat. A threat Defendants ignored.

Thus, **Defendant Copeland breached her duty as a Title IX Officer, exhibited deliberate indifference to Plaintiff's complaints of a threat of rape, and failed to address the serious criminal activity that could result from such an agreement and failed to investigate the same.** Further, the mixing of blood and semen, and the puncture wounds required for the same, can lead to the introduction of bloodborne pathogens and serious health consequences. Yet Defendant Copeland sees no harm in the same; thus, she was involved in the conspiracy to harm Plaintiff.

Defendant Copeland also does not address the texts in which Richard O tells Plaintiff that

he masturbates during their platonic phone conversations. Thus, she minimizes the evidence presented by Plaintiff in concluding that no investigation was warranted, when in fact, Richard O was engaging in activity that could possibly lead to rape or serious health risk. Richard O was not investigated at all, and Richard O may still believe that a person can escape criminal liability for rape by having the victim sign a contract because Defendant Copeland did not see any harm from the same. Plaintiff respectfully submits that Richard O's beliefs are far more threatening to the University community than Plaintiff's complaints of race and/or sex discrimination and retaliation. Thus, this claim should not be dismissed. See Exhibit H, Am. Compl. ECF No. 11.

**K. Count XI – Amendment V and XIV of the US Constitution**

While there is a higher bar for finding state action by a private educational institution than a public institution against students, that does not mean that a private educational institution can never be held liable for state action. Defendant admitted in their Motion to Dismiss that they threatened Missouri's law of trespass in the 1st degree against Plaintiff (penalty of up to 6 months in jail and $500 fine) and that Plaintiff was no longer allowed on campus. (See ECF 19) Defendants continue to threaten and retaliate against Plaintiff against the provisions of §§ 1981, 1983, and 1985 when the only acts that Defendant has alleged that were disruptive to the WashU community were Plaintiff engaging in protected activity regarding race and/or sex discrimination and retaliation at her former law school and employer, Defendant WashU.

If a private university receives significant state funding, its actions regarding discrimination may be considered state action. Further, Defendants looked to state and local police to enforce their suspension against Plaintiff. If Plaintiff breached the terms of her suspension, she would be held by the state. *Shelley v. Kraemer*, 334 US 1 (1948) (state action occurs whenever a state gives effect to, or fails to provide a remedy against a private restriction

of a 14th Amendment right). *Marsh v. Alabama*, 326 US 501 (1946) (company owned town residents had the same rights as municipality residents and the company could not infringe residents' 1st and 14th Amendment rights).

Since determinations of state action are highly fact dependent and specific, Plaintiff respectfully requests that the Court give Plaintiff the opportunity to prove her claims against Defendants for violating her 5th and 14th Amendment rights, by allowing these claims to survive Defendants' Motion to Dismiss. *Bell v. Maryland*, 378 US 226 (1964) (complicated and fact intensive decision regarding whether racial discrimination in the provision of public accommodations by a privately owned restaurant violated the 14th Amendment, and whether conviction of 12 African American students for criminal trespass would be upheld or dismissed.) Bell's case was not decided before the Complaint was answered. Plaintiff requests the same.

**L. Count XII – 42 U.S.C. § 1983**

"If an individual is possessed of state authority and purports to act under that authority, his action is state action." *Griffin v. Maryland*, 378 U.S. 130, 135 (1964). Further, "If the actor by force or threats of force, or by exerting legal authority, compels another to accompany him from place to place, he has as effectively confined the other as though he had locked him in a room." *Faniel v. Chesapeake & Potomac Telephone Co.*, 404 A.2d 147, 151 (D.C. 1979) "Detention can occur not only by actual force or by fear of force" but also "even by words." *Dent v. May Department Stores Co.*, 459 A.2d 1042, 1044 (D.C. 1982). Plaintiff was threatened with arrest if she were to return to WashU campus by WashU police by Defendants WashU, Gore, Wild, Walsh, and Davis after complaining of race and/or sex discrimination and retaliation, constituting a violation of Plaintiff's rights under 42 U.S.C. § 1983.

Further, Exhibit R of Plaintiff's Am. Complaint (ECF No. 11) is an article about

Defendant WashU's use of police force to retaliate against a woman who complained of genocide, the ultimate form of discrimination, and arrested her on at least two occasions. Defendant WashU uses a "Wanteds" system which enables any officer (federal, state, local, or WashU) in Missouri to arrest and detain persons of interest wanted for questioning, even if the arresting officer has no knowledge about the alleged underlying offense. Police can find the names of individuals wanted for questioning in a centralized system for law enforcement called the Regional Justice Information System. Police can arrest and detain those listed as "Wanted" without going to a judge, providing probable cause or getting an arrest warrant. Furthermore, Defendant WashU's "Wanteds" cannot be searched for in any public database, so there is no way of knowing whether one can be arrested at any time. Pl.'s Am. Compl. Ex. R, ECF No. 11.

Defendant WashU and its agents see Plaintiff's complaints of race and/or sex discrimination and retaliation as a "a pattern of disruptive and harassing behavior targeted at law school community members, including faculty and students" warranting arrest. Def. Mot. To Dismiss ECF No. 19 p. 33. Defendants have not accused Plaintiff, and have not retaliated against Plaintiff for any action other than Plaintiff complaining about race and/or sex discrimination and retaliation. Plaintiff respectfully submits that the WashU "wanted" policy of using the police to arrest people who complain about race and/or sex discrimination and retaliation caused Plaintiff to suffer a constitutional deprivation under Section 1983. See Leigh J. Jahnig, *Under School Colors: Private University Police As State Actors Under Section 1983*, 110 Nw. U. L. Rev. 249 (2015) Accordingly, Defendant's Motion to Dismiss Count XII - Section 1983 should be denied.

**M. Count XIII – DC Human Rights Act**

The D.C. Human Rights Act is a broad remedial statute, to be generously construed. *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 398 (D.C. 1991). We

have also described the Human Rights Act as a "powerful, flexible, and far-reaching prohibition against discrimination of many kinds." *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 732 (D.C. 2000) (citation and internal quotations omitted).

The DCHRA provides that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate." D.C. Code § 2-1403.16(a). Unlike Title VII or the Equal Pay Act, the DCHRA imposes liability on individuals. See D.C. Code § 2-1401.02(10); *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998) (finding that the DCHRA applies to individual partners of law firm when the partners acted in the interest of the employer, a law partnership); *Zelaya v. UNICCO Serv. Co.*, 587 F. Supp. 2d 277, 284-85 (D.D.C. 2008) (ruling that plaintiff's former supervisor could be held individually liable under the DCHRA).

Plaintiff is currently employed by Defendants in Washington D.C. However, “[T]he most important factor in determining whether a court has subject matter jurisdiction over a [DCHRA] claim is not whether the plaintiff was actually employed in the District of Columbia, but whether the alleged discriminatory acts occurred in the District.” *Cole v. Boeing Co*., 845 F. Supp.2d 277, 284 (D.D.C. 2012) If an employee is not employed in the District, “[e]ither the [adverse employment] decision must be made, or its effects must be felt, or both must have occurred, in the District of Columbia” for there to be jurisdiction under the DCHRA. *Monteilh v. AFSCME, AFL–CIO*, 982 A.2d 301(D.C. 2009). Unlike Ms. Cole (who did not claim to suffer any sex discrimination in DC), Plaintiff has repeatedly claimed that she suffered race and/or sex discrimination and retaliation from Defendants because she is a Black woman who engaged in protected activity in Missouri and Washington D.C. that were highly related, as all of the

Defendants have been a constant presence in discriminatory and retaliatory actions taken against Plaintiff in both Missouri and Washington D.C. Defendants WashU, Osgood, Walsh, Angela Smith, Peggy Smith, Katz, and Davis repeatedly told Plaintiff to not complain about the race and/or sex discrimination and retaliation she encountered as a Black woman in Missouri, then conspired to fail to send a timely letter of good standing to GULC in Washington D.C. at the end of Plaintiff's 1st year so she would be forced to attend WashU so that they would have access to Plaintiff to retaliate against her during her 2nd year in Missouri. Additionally, Defendants WashU, Osgood, Walsh and Burns revoked Plaintiff's scholarship in Washington D.C., and instituted collection proceedings claiming Plaintiff owed WashU $40,294.00 in Washington D.C. Defendant Walsh ignored Plaintiff's claims of sex and/or race discrimination and retaliation in Missouri, and interfered with Plaintiff's D.C. internships during her 2nd and 3rd year of law school. Defendant WashU also *just* disabled Plaintiff's email account, allison.brown@wustl.edu, while she is living and working in Washington D.C. See Section III of this filing on Pages 24-25.

As shown above, Plaintiff suffered a substantial amount of race and/or sex discrimination and retaliation in Washington D.C. Therefore, Defendants Motion to Dismiss Count XIII - DC Human Rights Act should be denied.

## VI. CONCLUSION

Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss, and/or order jurisdictional discovery.

Respectfully submitted,

Allison Brown, Esq.

DC Bar #: 90045586

## Exhibit A - Consortium Agreement

**Consortium Agreement between Washington University and**

Georgetown Law, **the Host School**

In the matter of financial aid for: Allison Brown SSN

This student is a degree candidate in the School of Law at Washington University and has permission to attend the Host School named above for the Fall 2023 Spring 2024 semester(s) as a visiting student. Washington University will register this individual under visiting student status, will assign credit for the courses taken at the Host School on the same basis as it would for course work taken at Washington University and will provide enrollment verification based upon said course work as approved by the School of Law.

With regard to financial aid, the institutional representatives signing below hereby agree to the following:

Washington University will determine financial aid eligibility and disburse all sources of financial aid for this student during this period of enrollment, according to institutional policy.

The Host School will award no financial assistance to this student but will provide Washington University with the following information.

Beginning and ending dates of each semester the student is to be enrolled at the Host School:

Fall 23 semester, classes begin on 8/28/23 and end on 12/15/23
Spring 24 semester, classes begin on 1/8/24 and end on 5/14/24

Cost of attendance for the total period of enrollment, as indicated above.

| | |
|---|---|
| Tuition and fees | $ 75,950 |
| Room and board | $ 24,220 |
| Books and supplies | $ 1,400 |
| Other Personal & Travel | $ 6,630 (Total $108,200 + actual loan fees. 50% each semester) |

Requested payment dates for direct charges:

Fall 23 semester, payment requested by 8/28/23
Spring 24 semester, payment requested by 1/8/24

Address where tuition payment should be sent:
Georgetown Law Financial Aid // 600 New Jersey Ave NW Room 335 // Washington, DC 20001

Confirmation of enrollment upon request and immediate notification of any change in enrollment status. Washington University will reimburse the Host School for the educational services it provides to the student (i.e., tuition and fees); Washington University will disburse to the student financial aid available for living expenses.

On behalf of Washington University: Name CARMG BURNS Date 8/15/23 Title: DIRECTOR OF FIN AID

On behalf of the Host School: Name Russell Augustine Date 8/11/23 Title: Financial Aid Counselor

**Exhibit B - Defendant WashU Unilateral Revocation of Scholarship for 2023-2024**

Washington University in St.Louis WebSTAC Allison Brown Logout

Academics Billing & Bear Bucks Housing Courses & Registration Student Information

Allison Brown (ID: 503456)

Current Balance: $ 46582.22

This information is correct as of 1/14/2024 12:39:06 PM

**Activity for Spring 2024**

| Sem | FY | Div | TCode | Description | Amount | Post Date | Tran Date | Bill Date |
|---|---|---|---|---|---|---|---|---|
| | | | | Student Bar Association Fee | 60.00 | | | |
| | | | | Student Health and Wellness Fee | 308.00 | | | |
| | | | | Tuition | 33504.00 | | | |
| | | | | Spring 2024 Semester Total | 33872.00 | | | |

**Activity for Fall 2023**

| Sem | FY | Div | TCode | Description | Amount | Post Date | Tran Date | Bill Date |
|---|---|---|---|---|---|---|---|---|
| | | | | Anticipated Federal Direct Loan, Unsubsidized (Stafford) | 0.00 | | | |
| | | | | Anticipated WU Scholarships and Grants | 0.00 | | | |
| | | | | Federal Direct Loan, Unsubsidized (Stafford) | (10142.00) | | | |
| | | | | Student Bar Association Fee | 0.00 | | | |
| | | | | Student Health and Wellness Fee | 0.00 | | | |
| | | | | Student Health Insurance | 2500.00 | | | |
| | | | | Tuition | 37975.00 | | | |
| | | | | WU Scholarships and Grants | 0.00 | | | |
| FL2023 | 2024 | LW | CASH | Cash Payment | (17455.02) | 7/31/2023 | 7/31/2023 | 7/31/2023 |
| FL2023 | 2024 | LW | LFEE | Late Fee | 249.22 | 12/27/2023 | 12/27/2023 | 12/28/2023 |
| | | | | Fall 2023 Semester Total | 13127.20 | | | |

**Activity for Spring 2023**

| Sem | FY | Div | TCode | Description | Amount | Post Date | Tran Date | Bill Date |
|---|---|---|---|---|---|---|---|---|
| | | | | Anticipated WU Scholarships and Grants | 0.00 | | | |
| | | | | Parking Permit | (416.98) | | | |
| | | | | Student Bar Association Fee | 60.00 | | | |
| | | | | Student Health and Wellness Fee | 288.00 | | | |
| | | | | Student Health Insurance | 1296.00 | | | |
| | | | | Tuition | 32244.00 | | | |
| | | | | WU Scholarships and Grants | (18500.00) | | | |
| SP2023 | 2023 | LW | CASH | Cash Payment | (15388.00) | 1/10/2023 | 1/10/2023 | 1/31/2023 |
| | | | | Spring 2023 Semester Total | (416.98) | | | |

**Exhibit B - Defendant WashU Unilateral Revocation of Scholarship for 2023-2024**

Washington University in St. Louis

*DUE UPON RECIEPT*
*Second Notice*

| | |
|---|---|
| Statement Date | 8/28/2024 |
| Student ID | 503456 |

Allison Brown
2000 Flourmill Ct
Crownsville, MD 21032
Usa

| | |
|---|---|
| Beginning Balance | $41,099.88 |
| Monthly Activity | $0.00 |
| Outstanding Balance | $41,099.88 |

This letter is the second notice that your outstanding balance is past due with Washington University in St. Louis in the amount of $41,099.88. Your balance needs to be paid in full within 10 days, or a special payment arrangement must be set-up, to avoid further action. As a reminder, holds are placed to alert you to an unmet requirement or obligation that is past due, and to prevent you from certain actions until the requirement is met. Holds placed for financial balances owed prevent class registration; holds placed for any other reason prevents class registration and the release of official transcripts.

Please use the enclosed return envelope when mailing your payment. If you are unable to pay your balance at this time, please contact Student Billing at (314) 935-5274 or e-mail student.billing@wustl.edu to set-up a special payment arrangement, or to take Any transactions posted to your account since your last statement are detailed below. You may review your entire account history online by accessing WebSTAC at https://acadinfo.wustl.edu. Once you are online your account history is located under Billing Bear Bucks - Account Inquiry.

**Monthly Activity Detail**

| Date | Code | Description | Amount |
|---|---|---|---|
| | | | |

DETACH HERE AND RETURN LOWER PORTION

| STUDENT ID | NAME |
|---|---|
| 503456 | Allison Brown |

AMOUNT TO CHARGE

| ACTIVITY THROUGH | PAYMENT DUE NOW |
|---|---|
| 8/28/2024 | $41,099.88 |

Visa MC Exp. Date

SIGNATURE

Allison Brown

MAKE CHECK PAYABLE AND SEND TO:

Washington University in St. Louis
P.O. Box 14627
St. Louis, MO 63150-4627

- Do not send cash
- Write Student ID number on your check

Address change? Check box and write your new address on back.

**Exhibit C - Issuance of Scholarship on July 27, 2023**

**Saturday, November 18, 2023 at 22:28:46 Eastern Standard Time**

**Subject:** WashULaw 2023-24 Financial Aid
**Date:** Thursday, July 27, 2023 at 9:22:58 AM Eastern Daylight Time
**From:** finance@wulaw.wustl.edu <finance@wulaw.wustl.edu>
**To:** Brown, Allison <allison.brown@wustl.edu>
**Attachments:** image001.jpg

Washington University in St. Louis
SCHOOL OF LAW
**Financial Aid**

To: Allison S. Brown
2000 Flourmill Court
Crownsville, MD 21032

From: Carrie Burns, Director of Financial Aid and Student Life, School of Law
*cjburns@wustl.edu | (314) 935-4605*

Date: July 27, 2023

The Financial Aid Committee reviewed your application for assistance and makes the following aid offer for the entire 2023-2024 academic year. Your offer is based on full-time student status.

| Source | Fall | Spring | Total |
|---|---|---|---|
| Washington University Law Scholarship | $18,500 | $18,500 | $37,000 |
| Federal Direct Unsubsidized Loan | $10,250 | $10,250 | $20,500 |
| | ------- | ------- | ------- |
| Total | $28,750 | $28,750 | $57,500 |

Tuition and fees for the 2023-2024 academic year are $67,744.

**To accept your Financial Aid offer, please complete the following steps:**

1) Visit netpartner.wustl.edu. Use your WUSTL Key ID and Password to log in. Select 'Accept Offer' in the top left side menu.
2) Provide all required documents listed in 'Documents & Messages'.

**Exhibit C - Issuance of Plaintiff's Scholarship on July 27, 2023**

---

If your aid offer includes the Federal Direct Graduate PLUS loan you will need to visit Federal Student Aid and complete the Graduate PLUS application.

If you have questions about your aid offer, please contact me to schedule a time to discuss the details, including whether a reduction or increase of your loan amount is most appropriate, as well as repayment strategies and next steps. Each student faces unique obligations and factors that impact the appropriate loan amount. I look forward to assisting you throughout this process.

**Exhibit D - Correspondence from US Department of Education regarding Consortium Agreement**

Fw: Fwd: FSA Feedback Case: 16413585 - asb151@georgetown.edu - Georgetown University Mail

arch mail Active

1 of 7,640

On Tue, Feb 13, 2024 at 8:05 PM Federal Student Aid Information Center <customerservice@studentaid.gov> wrote:

2/13/2024

Dear Ms. Brown:

Thank you for contacting the U.S. Department of Education's (ED) office of Federal Student Aid (FSA). We have reviewed your complaint in case number 16413585 regarding Washington University in St. Louis (WUSL).

The following actions were taken on your behalf:

- The school was contacted to provide a response to your concerns.
- We researched our departmental systems and confirmed that the school's response matches the records that we maintain at ED.

**Exhibit D - From US Department of Education re: Consortium Agreement**

2/13/2024

Dear Ms. Brown:

Thank you for contacting the U.S. Department of Education's (ED) office of Federal Student Aid (FSA). We have reviewed your complaint in case number 16413585 regarding Washington University in St. Louis (WUSL).

The following actions were taken on your behalf:

- The school was contacted to provide a response to your concerns.
- We researched our departmental systems and confirmed that the school's response matches the records that we maintain at ED.

Our office provides oversight and monitoring of schools that participate in FSA Programs. Your case was selected for additional review. You have submitted a complaint concerning the status of your William D. Ford Federal Direct Loan (Direct Loan) taken out at WUSL while you are attending Georgetown University – Law Center (GULC). You advised in your case you are transferring to GULC from WUSL. This is not WUSL's understanding, there is a Consortium Agreement (CA) between WUSL and GULC. The CA is an agreement between both schools and student that you will remain a student at your home school, WUSL, while attending the host school, GULC. The home school is responsible for paying the host school the tuition you are being charged at the visiting school. WUSL has paid GULC $75,950 for your 2023-24 tuition at GULC and they have accepted $20,500 in Direct Loans to help cover the balance owed to WUSL for paying your GULC tuition. WUSL has provided the signed consortium agreement between the schools. The CA allows you to take coursework at GULC while attending WUSL. If you intend on transferring to GULC permanently, you will need to apply and be accepted to GULC as a GULC student. Until then, you are officially a WUSL student being hosted by GULC. Please work with WUSL to pay the remaining balance owed to them for your tuition at GULC as WUSL has already paid GULC your full tuition amount for 2023-24. Thank you for the opportunity to research your concerns.

We hope this information is helpful to you. We have closed your case. We wish you success with your future educational endeavors.

Respectfully,

Jay Knodell
Customer Engagement Specialist – Team Lead

Resolution and Referral Management Group
Federal Student Aid/U.S. Department of Education

*To respond to this email, please reply to this email thread without modifying the Subject line. That way, your response will automatically attach to your case.*

Federal Student Aid | PROUD SPONSOR of the AMERICAN MIND™

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.



GATTEX may cause serious side effec
Making abnormal cells grow faster
GATTEX can make abnormal cells that
grow faster. There is an increased risk t
become cancer. If you get cancer of the
gallbladder or pancreas while using GA

**Exhibit E - EEOC Right to Sue**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Washington Field Office**
131 M Street, NE Fourth Floor, Suite 4NWO2F
Washington, DC 20507
(800) 669-4000
Website: www.eeoc.gov

**DISMISSAL**
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 08/29/2026

**To:** Ms. Allison Brown
5115 Call Pl SE
Washington, DC 20019
Charge No: 570-2026-04197

EEOC Representative and email: ROBERT HERSEY
ADMINISTRATIVE SUPPORT ASSISTANT
ROBERT.HERSEY@EEOC.GOV

---

**DISMISSAL**

The EEOC is closing this charge because you have already filed a lawsuit in court on this matter.

**NOTICE OF YOUR RIGHT TO SUE**

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 570-2026-04197.

On behalf of the Commission,

Digitally Signed By:Mindy E. Weinstein
08/29/2026

Mindy E. Weinstein
Director

**Exhibit E - EEOC Right to Sue**

**Cc:**
Jamie Ball
Washington University In St. Louis
1 Brookings Drive
Saint Louis, MO 63130

Joseph Sklansky
Washington University In St. Louis
1 Brookings Drive
University City, MO 63130

Incident Location
Washington University in St. Louis
1776 Massachusetts Avenue NW Suite 705
Washington, DC 20036

Allison Brown Esq.
5115 Call Pl SE
Washington, DC 20019

Please retain this Notice for your records.

**Exhibit E - EEOC Right to Sue**

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

## Exhibit E - EEOC Right to Sue

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 570-2026-04197 to the District Director at Mindy E. Weinstein, 131 M Street, NE Fourth Floor Suite 4NWO2F, Washington, DC 20507.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 570-2026-04197 to the District Director at Mindy E. Weinstein, 131 M Street, NE Fourth Floor Suite 4NWO2F, Washington, DC 20507.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**Exhibit F - Plaintiff's W-2 from Defendants - Not an Independent Contractor**



Employee Reference Copy
W-2 Wage and Tax Statement 2022
Copy C for employee's records. OMB No. 1545-0008

d Control number: 0000038004 NOV | Dept. | Corp.: C50T | Employer use only: S 1247

c Employer's name, address, and ZIP code:
THE WASHINGTON UNIVERSITY IN ST LOUIS
700 ROSEDALE AVE
MAIL STOP 1000-0423-01
ST LOUIS, MO 63112

e/f Employee's name, address, and ZIP code:
ALLISON S BROWN
2000 FLOURMILL COURT
CROWNSVILLE, MD 21032

| | |
|---|---|
| b Employer's FED ID number: 43-0653611 | a Employee's SSA number: XXX-XX-2263 |
| 1 Wages, tips, other comp.: 1000.00 | 2 Federal income tax withheld |
| 3 Social security wages | 4 Social security tax withheld |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 7 Social security tips | 8 Allocated tips |
| 9 | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| 14 Other | 12b / 12c / 12d |
| | 13 Stat emp. / Ret. plan / 3rd party sick pay |
| 15 State / Employer's state ID no.: TOTAL STATE | 16 State wages, tips, etc. |
| 17 State income tax: 15.90 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

2022 W-2 and EARNINGS SUMMARY

This summary section is included with your W-2 to help describe this portion in more detail. The reverse side includes general information that you may also find helpful. The following reflects your final pay stub, plus any adjustments made by your employer.

| | | | |
|---|---|---|---|
| GROSS PAY | 1,000.00 | SOCIAL SECURITY TAX WITHHELD BOX 04 OF W-2 | 0.00 |
| FED. INCOME TAX WITHHELD BOX 02 OF W-2 | 0.00 | MEDICARE TAX WITHHELD BOX 06 OF W-2 | 0.00 |
| STATE INCOME TAX BOX 17 OF W-2 | 15.90 | SUI/SDI BOX 14 OF W-2 | 0.00 |
| LOCAL INCOME TAX BOX 19 OF W-2 | 0.00 | | |

To change your employee W-4 profile information file a new W-4 with your payroll department

ALLISON S BROWN
2000 FLOURMILL COURT
CROWNSVILLE, MD 21032

Social Security Number: X

© 2022 ADP, Inc.

PAGE 01 OF 02

Fold and Detach Here

| | |
|---|---|
| 1 Wages, tips, other comp.: 1000.00 | 2 Federal income tax withheld |
| 3 Social security wages | 4 Social security tax withheld |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| d Control number: 0000038004 NOV / Dept. / Corp.: C50T | Employer use only: 1247 |

c Employer's name, address, and ZIP code:
THE WASHINGTON UNIVERSITY IN ST LOUIS
700 ROSEDALE AVE
MAIL STOP 1000-0423-01
ST LOUIS, MO 63112

| | |
|---|---|
| b Employer's FED ID number: 43-0653611 | a Employee's SSA number: XXX-XX-2263 |
| 7 Social security tips | 8 Allocated tips |
| 9 | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| 14 Other | 12b / 12c / 12d |
| | 13 Stat emp. / Ret. plan / 3rd party sick pay |

e/f Employee's name, address and ZIP code:
ALLISON S BROWN
2000 FLOURMILL COURT
CROWNSVILLE, MD 21032

| | |
|---|---|
| 15 State / Employer's state ID no.: TOTAL STATE | 16 State wages, tips, etc. |
| 17 State income tax: 15.90 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

Federal Filing Copy
W-2 Wage and Tax Statement 2022
Copy B to be filed with employee's Federal Income Tax Return. OMB No. 1545-0008

| | |
|---|---|
| 1 Wages, tips, other comp.: 1000.00 | 2 Federal income tax withheld |
| 3 Social security wages | 4 Social security tax withheld |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| d Control number: 0000038004 NOV / Dept. / Corp.: C50T | Employer use only: 1247 |

c Employer's name, address, and ZIP code:
THE WASHINGTON UNIVERSITY IN ST LOUIS
700 ROSEDALE AVE
MAIL STOP 1000-0423-01
ST LOUIS, MO 63112

| | |
|---|---|
| b Employer's FED ID number: 43-0653611 | a Employee's SSA number: XXX-XX-2263 |
| 7 Social security tips | 8 Allocated tips |
| 9 | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a |
| 14 Other | 12b / 12c / 12d |
| | 13 Stat emp. / Ret. plan / 3rd party sick pay |

e/f Employee's name, address and ZIP code:
ALLISON S BROWN
2000 FLOURMILL COURT
CROWNSVILLE, MD 21032

| | |
|---|---|
| 15 State: MD / Employer's state ID no.: 0917361 5 | 16 State wages, tips, etc.: 1000.00 |
| 17 State income tax: 15.90 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

MD. State Reference Copy
W-2 Wage and Tax Statement 2022
Copy 2 to be filed with employee's State Income Tax Return. OMB No. 1545-0008

## Exhibit G - Retaliation for Protected Activity

Student Conduct and Community Standards
STUDENT AFFAIRS AT WASHINGTON UNIVERSITY

January 20, 2023

Allison Brown
Allison.brown@wustl.edu

**PERSONAL AND CONFIDENTIAL**
Via Electronic Mail

Re: Student Conduct Matter and Options for Resolution

Dear Allison:

As you are aware, this office received a complaint from the School of Law alleging that you have engaged in a pattern of disruptive and harassing behavior inside and outside of the classroom in violation of the University Student Code of Conduct. The School of Law alleges that some of this conduct began prior to your matriculation and continued during the Spring and Fall 2022 semesters, even after faculty and administrators communicated with you regarding concerns about your behavior. Specifically, the School of Law alleges that it received reports from multiple students and faculty that:

1. Students do not feel comfortable participating in classes they share with you because you have posted derogatory and inflammatory remarks about your classmates and their class-related comments on social media;
2. You have engaged in a pattern of attacking students on social media who do not share your views or with whom you disagree;
3. You have engaged in similarly disruptive behavior in class and on course instruction platforms; and
4. One student reported that they did not feel comfortable meeting in person with Dean Walsh because they had heard you knew who came to Dean Walsh's office.

The School of Law alleges that as a result of your behavior, students have been unable to fully participate in the law school classroom and in extracurricular activities, and law school community members have been impeded in their ability to engage in educational, administrative, professional and other functions.

These allegations, if true, would be a violation of one or more of the following offense(s):

University Student Conduct Code/2. Interfering with the rights of other members of the University community or visitors to the University to engage in educational, recreational, residential, administrative, professional, business, and ceremonial activities or other functions.

University Student Conduct Code/4. Stalking, hazing, engaging in domestic, dating, or interpersonal violence, or any other conduct which harasses, threatens, or endangers the safety or health of, any member of the University community or visitor to the University.

Student Conduct and Community Standards
STUDENT AFFAIRS AT WASHINGTON UNIVERSITY

The School of Law has agreed to withdraw its complaint and settle this matter, in lieu of proceeding forward with a University Student Conduct Board hearing, subject to the terms and conditions below:

1. Allison Brown will complete the Spring 2023 semester through an off-campus externship or other non-campus program that qualifies for the School of Law credits and by enrolling in Legal Practice II remotely.[1] To enable Allison to do so, the School of Law will allow Allison to work for the appropriate number of credits at the National Center for Youth Law and/or the United Nations Permanent Forum for People of African Descent per the terms of the previously-submitted offer letters. The School of Law will also allow Allison to receive a stipend from her employers in addition to the academic credit granted through the School of Law. The School of Law will identify the Legal Practice II instructor and enroll Allison in that course.

2. Allison Brown will apply for admission as a visiting student to other law schools to complete her third year of law school. If Allison enrolls at another law school as a visiting student, the School of Law will grant her leave as needed.

3. The School of Law will review all courses in which Allison Brown enrolls at another accredited law school. So long as Allison earns the equivalent of a "C" or higher, the course meets a School of Law degree requirement, and the course is not duplicative of any course Allison has already taken, the School of Law will not unreasonably withhold acceptance of the associated transfer credits. Barring unusual or atypical circumstances, accurate and equivalent categorization of a course at a different law school will generally indicate that the course will fulfill School of Law degree requirements. The School of Law will review any courses in which Allison indicates an intention to register at or before the time of registration to confirm that each such course would fulfill School of Law degree requirements and would be eligible for transfer credit if successfully completed.

4. Assuming Allison Brown successfully completes the School of Law's requirements for a J.D. by the end of the 2023-2024 academic year, including an ethics course and a seminar, Allison will receive a J.D. from the School of Law.

5. Allison Brown will be allowed to enroll in classes at the School of Law for one semester during the 2023-2024 academic year to complete her law degree remotely[2] if and only if (i) Allison is not accepted into a visiting student or study abroad program at another law school and (ii) she demonstrates to the School of Law's satisfaction that she has made

[1] Remote enrollment will be asynchronous and/or synchronous as determined by the course instructor.
[2] See footnote 1.

Student Conduct and Community Standards
STUDENT AFFAIRS AT WASHINGTON UNIVERSITY

systematic, sustained and diligent efforts to obtain admittance elsewhere.[3] In the event that Allison is allowed to enroll in classes at the School of Law for one semester during the 2023-2024 academic year, Associate Dean Elizabeth Walsh will work with her to insure that she enrolls in courses that are appropriate for remote, asynchronous learning.

. Allison Brown will not attend any Washington University sponsored events and will notbe permitted on the Washington University campus (or any university owned, leased,managed or rented property) without advance permission. Permission must be soughtthrough Associate Dean Elizabeth Walsh or Dean of Students Rob Wild.

. In the event Allison Brown returns to the School of Law in the 2023-2024 academic year (orwith regards to Legal Practice II), she will not take any course taught by ProfessorsAdrienne Davis, Elizabeth Katz, Ann Shields or Peggie Smith.

. Allison Brown will not contact any student who was named as a witness or identified inany School of Law exhibits, including emails, in the 2022 Student Conduct Proceeding.

. As Allison Brown continues her work toward her School of Law degree, she will continueto pay tuition and fees to the School of Law. Allison will also maintain her meritscholarship, which shall be credited toward her School of Law tuition and fees. In theevent Allison attends an institution as a visiting student with tuition and fees greaterthan the School of Law's, she will be solely responsible for any difference.

. <u>Release</u>

Allison Brown, for herself and her family members, heirs, personal representatives, and assigns, hereby releases and forever discharges Washington University in St. Louis, including the School of Law, its trustees, employees, former employees, faculty, administrators, students, representatives, insurers, attorneys, agents, and assigns ("Released Parties") from and against any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, claims, liabilities and demands of whatever kind and character, whether known or unknown, suspected or unsuspected, and whether based on contract, tort, statutory or other legal or equitable theory of recovery, that she now has or may have had, or hereafter may claim to have, on behalf of herself or any other person or entity, including but not limited to claims arising out of or relating in any way to the Student Conduct Proceeding, the temporary suspension and/or Allison Brown's attendance at the School of Law. Allison Brown further promises to not initiate any proceeding (including, <u>without limitation, under any</u> School

[3] American Bar Association Standard 311(e) allows law schools to grant up to 1/3 of the credits required for a J.D. through distance education. Thus, Allison may complete two of her remaining three semesters asynchronously. At least one semester must be completed through a School of Law study abroad program or as a visiting student at another law school.

Student Conduct and Community Standards
STUDENT AFFAIRS AT WASHINGTON UNIVERSITY

of Law policy or procedure, other administrative action, or other legal action) arising out of or relating to the Student Conduct Proceeding, the temporary suspension and/or Allison Brown's attendance at the School of Law, against the Released Parties.

11. Non-Disparagement

Allison Brown agrees that she will not hereafter publish to any other person or entity, either orally or in writing, including, but not limited to the news media, any social media platform, through the internet, U.S. Postal Service or any other commercial mailing, and/or any other type of hard copy or online publication, even on an anonymous basis, any disparaging or negative statements about the Released Parties. It is understood that the School of Law administration will answer truthfully any inquiries they receive regarding Allison Brown from other academic institutions, bar examiners or government officers. However, the School of Law administration will not affirmatively reach out to any such parties and will limit any response it provides to the specific inquiry received. If Allison Brown violates any of the provisions of this paragraph, such shall be a material breach of this agreement and cause for the Released Parties to seek legal and/or equitable remedies against her.

12. Upon receipt of the final signed agreement, School of Law will withdraw the pending student conduct complaint and remove any notation related to that complaint from Allison Brown's transcript.

If you do not wish to agree to the terms and conditions above, you may choose to continue to proceed with the Student Conduct Board hearing process under the University Student Conduct Code.

Please let me know how you wish to proceed. If you choose to accept the terms and conditions above, I ask that you sign, date, and return this document to me. Please keep a copy and maintain it for your records. If you choose to proceed with a Student Conduct Board hearing, we will work with your attorney to set up an appropriate time.

Sincerely,

Nicole R Gore

Nicole Gore
Associate Dean

cc: Elizabeth Walsh, Associate Dean
Rob Wild, Associate Vice Chancellor and Dean of Students

Student Conduct and Community Standards
STUDENT AFFAIRS AT WASHINGTON UNIVERSITY

**Acknowledgement**

I acknowledge that I have read and accept the terms and conditions set forth above. I acknowledge that this agreement is a means to formally and mutually resolve the pending University student conduct matter.

____________________________ ____________________________

Allison Brown Date

Student ID # 503456

Washington University in St. Louis

STUDENT AFFAIRS

**Associate Vice Chancellor for Student Affairs and Dean of Students**

November 4, 2022

Allison Brown
allison.brown@wustl.edu

Dear Allison,

I was recently contacted by the School of Law, which alleges that you have engaged in a pattern of disruptive and harassing behavior targeted at law school community members, including faculty and students. Specifically, you are reported to have been disruptive in multiple classes and to have generally engaged in unprofessional and harassing behavior that interferes with or prevents faculty members and students from fully participating in the learning environment. These allegations are concerning and, if true, they would violate our University Student Conduct Code.

Your continued presence on campus poses a substantial threat to the ability of faculty and other students to continue their normal University functions and activities. Therefore, by authority granted by the University Student Conduct Code Section X.A., I must notify you that you are temporarily suspended from Washington University.

**Effective immediately, you are no longer permitted on campus. You will be permitted to complete your classes remotely, as noted below.**

The terms of this temporary suspension, which takes effect immediately, are as follows:

1. You are prohibited from being present on any Washington University campus or any University leased or owned property, including but not limited to the Danforth Campus, the School of Law, any Residential Life-managed on and off-campus residence halls and apartments, and the Danforth University Center and the Athletic Complex. If you are found in violation of these expectations, you will be physically removed from campus and subject to arrest by Washington University Police. If you wish to be present on campus for any reason, including to visit Habif Health and Wellness Center +you must seek prior approval from me.
2. You are prohibited from participating in any University activities, with the exception of courses that will be recorded for you. This means, for example, that you are not permitted to participate in student organizations that you may belong to.
3. Your ongoing participation in courses will be through asynchronous viewing of class recordings. Any questions you have for the instructor must be in writing and delivered through Dean Elizabeth Walsh. Dean Walsh will work with the instructor to provide responses to your questions.
4. If you wish to meet with me under Section X D. to discuss this temporary suspension, you should do so within five business days from receiving this notice. Please call my office at 314-935-4526 to make an appointment and secure permission to be present on campus.

Washington University in St. Louis
STUDENT AFFAIRS

5. The law school will be filing a complaint with the Office of Student Conduct and Community Standards within ten days. Your temporary suspension will remain effective until that student conduct matter is resolved.

I understand that the news of this temporary suspension may be upsetting to you. If you would like to speak with a counselor to help process this information, please let me know and I can help connect you to a counselor who could meet with you as soon as possible today. You are also welcome to contact Habif Health and Wellness Center directly at 314-935-6695 or you can contact a counselor through our telehealth service, Timely Care. For 24/7 student access to free medical and mental health support through Timely Care, download the Timely Care app at: https://timely.md/schools/index.html?school=wustl& .

Please let me know if you have any additional questions.

Sincerely,

Robert M. Wild

Robert M. Wild
Associate Vice Chancellor for Student Affairs & Dean of Students

cc:
Angela Coonce, Chief of Police, Washington University Police Department
Nicole Gore, Associate Dean, Office of Student Conduct and Community Standards

## Exhibit H - WashU Conspiracy

**From:** Baker, Scott
**To:** Smith, Peggie
**Cc:** Katz, Elizabeth; Walsh, Elizabeth; Osgood, Russell
**Subject:** Re: Meeting
**Date:** Friday, February 25, 2022 3:19:04 PM
**Attachments:** image001.png

---

Elizabeth

I agree this is unfortunate and disturbing. I hope Allie understands that she is interfering with the learning of others and that is not permissible.

I would just avoid calling on her in the ways Peggie suggested. If you want to talk feel free to give me a call.

Sent from my iPhone

> On Feb 25, 2022, at 2:40 PM, Smith, Peggie <prsmith@wustl.edu> wrote:
>
> Hi Elizabeth,
>
> That's very unfortunate. Ultimately the proof is in the pudding. Even as the meeting did not go as expected, you will soon discover if she continues to disrupt the class. If she does, lean on some of the strategies discussed earlier:
>
> <!--[if !supportLists]-->• <!--[endif]-->"I see your hand, please put it down. I want to hear from other voices."
>
> <!--[if !supportLists]-->• <!--[endif]-->Look to frame your questions in terms of forcing students to express views that aren't their own personal views. If she starts with her personal views, promptly get her back on track.
>
> <!--[if !supportLists]-->• <!--[endif]-->When appropriate, tell her that her comments are "unhelpful to fostering class discussion." When she asks what you mean, ask her to see you after class or in office hours.
>
> <!--[if !supportLists]-->• <!--[endif]-->Don't allow her to give long answers that aren't on point. Feel free to interject and get the conversation back on track.
>
> In the meantime, please keep us abreast and the investigation by the University will continue.
>
> *Really, really sorry* that you are experiencing this along with the other students in the class.
>
> Peggie
>
> **From:** Katz, Elizabeth <elizabeth.katz@wustl.edu>
> **Sent:** Friday, February 25, 2022 2:26 PM
> **To:** Walsh, Elizabeth <ewalsh@wustl.edu>

**Cc:** Smith, Peggie <prsmith@wustl.edu>; Osgood, Russell <rosgood@wustl.edu>; Baker, Scott <bakerscott@wustl.edu>
**Subject:** Re: Meeting

Dear Russell, Peggie, and Scott,

The conversation with Allie was not very productive in my view. She was unwilling to acknowledge that it was inappropriate or chilling to dismiss another student's comment by saying he held that perspective because he was white. Her general reaction to the conversation was that I was attempting to police her because she's a Black woman and that my course is "violent" in not addressing race in the manner she thinks it should.

Elizabeth and I did not have an opportunity to discuss this because I had to go straight into another office hours appointment, so I'm not sure if her read of the meeting is the same.

Best,
Elizabeth

On Fri, Feb 25, 2022 at 9:58 AM Elizabeth Katz <elizabeth.katz@wustl.edu> wrote:

> Dear Elizabeth,
>
> Thank you for offering to join the meeting. I think that may be helpful. Allie confirmed she will attend my office hours today, but she did not schedule a time. If she doesn't do so shortly, I will ask her to pick a specific time and let her know that you will be joining as well. (Students reserve my office hours times through Canvas.)
>
> Thanks,
> Elizabeth
>
> On Fri, Feb 25, 2022 at 9:56 AM Walsh, Elizabeth <ewalsh@wustl.edu> wrote:
>
>> Hi, Elizabeth –
>> I understand that you are meeting with Allie Brown this afternoon. I will gladly join the meeting if you think that would be helpful. Just let me know if you'd like me to be there, and then, the time.
>>
>> Best,
>> Elizabeth
>>
>> <image001.png> Elizabeth Walsh | She/Her
>> Associate Dean for Student Life & Academic Services
>> **Washington University School of Law**
>> Direct: 314.935.5861 | Office: 314.935.4610
>> Meet with Me in Person or Meet with Me Virtually

--
**Elizabeth D. Katz**, J.D., Ph.D. (History)
Associate Professor of Law
Washington University School of Law
One Brookings Drive, MSC 1120-250-258
St. Louis, MO 63130
SSRN | elizabeth.katz@wustl.edu | Twitter @elizabethdkatz

--
**Elizabeth D. Katz**, J.D., Ph.D. (History)
Associate Professor of Law
Washington University School of Law
One Brookings Drive, MSC 1120-250-258
St. Louis, MO 63130
SSRN | elizabeth.katz@wustl.edu | Twitter @elizabethdkatz

**From:** Katz, Elizabeth
**To:** Smith, Peggie
**Cc:** Walsh, Elizabeth; Osgood, Russell
**Subject:** Re: Draft email
**Date:** Sunday, February 27, 2022 3:37:23 PM
**Attachments:** Outlook-cid_image0.png
2DD18B48784F4E09A6956D695D89388B.png

Thank you. I just spoke with Angela. Angela thought emailing Allie to explain I wouldn't be calling on her for two weeks would add fuel to the fire. She wasn't sure of the best alternative. My current plan is to come prepared with enough narrowly framed questions to minimize space for disruptive comments. If Allie raises her hand, I will use some of Peggie's previously suggested responses, such as "I see your hand, please put it down. I want to hear from other voices." I may also suggest in a more general way that we have less time for comments than usual because we need to be sure to cover all the material before Susan's guest lecture on Thursday. I will offer to take questions and comments after class, which I always do anyway.

Thanks again to you all!

Best,
Elizabeth

On Sun, Feb 27, 2022 at 2:33 PM Smith, Peggie <prsmith@wustl.edu> wrote:

> Hi Elizabeth,
>
> Please know that if I can be of any additional help as you process your thoughts, I am available if you wish to chat.
>
> Best,
>
> Peggie
>
> Sent from Mail for Windows
>
> ---
>
> **From:** Smith, Peggie
> **Sent:** Sunday, February 27, 2022 1:04 PM
> **To:** Walsh, Elizabeth; Osgood, Russell; Katz, Elizabeth
> **Subject:** RE: Draft email

**From:** Smith, Peggie
**Sent:** Sunday, February 27, 2022 1:04 PM
**To:** Walsh, Elizabeth; Osgood, Russell; Katz, Elizabeth
**Subject:** RE: Draft email

[redacted]

Hi Elizabeth,

I promised to follow up with you about the letter. It makes the intended point. I tinkered with the key sentences and offer the following rewrite for your consideration: "For the next two weeks, I will not call on you in class. Please do not raise your hand. I am pursuing this course of action because far too many students have informed me that they feel silenced by your commentary in class and on social media. Some of your comments have also disrupted the classroom atmosphere in ways that are not conducive to learning and have halted the progress of the course."

If you proceed in the direction that Elizabeth W. suggests, you might offer to hold a special office hours or extra hours for students to raise questions about the material you plan to cover this week.

Best,

peggie

Sent from Mail for Windows

**From:** Walsh, Elizabeth <ewalsh@wustl.edu>
**Sent:** Sunday, February 27, 2022 12:53:03 PM
**To:** Osgood, Russell <rosgood@wustl.edu>; Katz, Elizabeth <elizabeth.katz@wustl.edu>; Smith, Peggie <prsmith@wustl.edu>
**Subject:** Re: Draft email

Hi, Elizabeth -

I've been thinking about this a lot, and I think it might make sense for you to announce to your entire class that you won't be taking comments this week because of the material you will be covering. Then, as Peggie suggested, you could see how things go with Allie the following week. If there's no improvement, you could send her the email.

Best,

[redacted]

Elizabeth

Elizabeth Walsh | She/Her

Associate Dean for Student Life & Academic Services

Washington University School of Law
Direct: 314.935.5861 | Office: 314.935.4610

Schedule an Appointment

**From:** Osgood, Russell <rosgood@wustl.edu>
**Sent:** Saturday, February 26, 2022 12:31 PM
**To:** Katz, Elizabeth <elizabeth.katz@wustl.edu>; Smith, Peggie <prsmith@wustl.edu>; Walsh, Elizabeth <ewalsh@wustl.edu>
**Subject:** Re: Draft email

Elizabeth and Peggie, The most important thing is or you to feel confident in the path you choose. What you and Peggie suggest ius a sensible next step. I have read the letter and i you decide to go down this path then you could use it. Russell

**From:** Katz, Elizabeth <elizabeth.katz@wustl.edu>
**Sent:** Saturday, February 26, 2022 11:11 AM
**To:** Osgood, Russell <rosgood@wustl.edu>; Smith, Peggie <prsmith@wustl.edu>; Walsh, Elizabeth <ewalsh@wustl.edu>
**Subject:** Draft email

Dear Russell, Peggie, and Elizabeth,

Thanks again for your advice and support. I'm attaching a draft of the email we discussed.

As I've been reflecting on the situation more, I do fear that Allie will see this as further evidence that I am a naive or even racist white woman silencing her based on her identity and "tone-policing." It may play into her hands and inflame the situation further. Maybe an unofficial policy of calling on her less over the coming weeks would be more effective? I'm really unsure. I was already planning to minimize comments by volunteers this week

> because that's been my approach to teaching sexual assault in the past.
>
> Do you think it might be productive for me to speak to Angela? She may have insights about Allie's frame of mind and how to move forward. If you think that might be worthwhile, do you know if she would be available on the weekend?
>
> Thank you,
>
> Elizabeth
> --
>
> **Elizabeth D. Katz**, J.D., Ph.D. (History)
>
> Associate Professor of Law
>
> Washington University School of Law
>
> One Brookings Drive, MSC 1120-250-258
>
> St. Louis, MO 63130
>
> SSRN | elizabeth.katz@wustl.edu | Twitter @elizabethdkatz

--

**Elizabeth D. Katz**, J.D., Ph.D. (History)

Associate Professor of Law

Washington University School of Law

One Brookings Drive, MSC 1120-250-258

St. Louis, MO 63130

SSRN | elizabeth.katz@wustl.edu | Twitter @elizabethdkatz

"Frame of mind"

**Exhibit I - Defamatory Student Conduct Board Determination - Indelible School Record Furnished to Plaintiff's Employers and Prospective Bar Associations as late as April 2026**

Student Conduct and Community Standards
STUDENT AFFAIRS AT WASHINGTON UNIVERSITY

**CONFIDENTIAL**

**UNIVERSITY STUDENT CONDUCT BOARD**

**WASHINGTON UNIVERSITY IN ST. LOUIS**

**April 27, 2023**

**In the matter of Allison Brown**
**Case No. 00748-2002**

**DECISION OF THE UNIVERSITY STUDENT CONDUCT BOARD**

In this matter, a complaint was submitted to the Office of Student Conduct and Community Standards ("OSCCS") by the School of Law ("Complainant") against law student, Allison Brown ("Respondent"), alleging violations of Offense Nos. 2 and 4 of the University Student Conduct Code ("Code"). The Panel deliberated following the conclusion of Phase One and carefully weighed the evidence. Although the Panel has concerns about the Respondent's behavior and the abrasive choices she makes when interacting with others and online, ultimately the Panel determined there was not sufficient evidence to establish that it was more likely than not that the Respondent engaged in a violation of Offense Nos. 2 or 4 of the Code.

***Complaint Allegations***

The Complainant School of Law alleged that the Respondent engaged in a pattern of disruptive and harassing behavior inside and outside of the classroom, which began prior to the Respondent's matriculation, continued during the Spring 2022 semester, and persisted into the Fall 2022 semester, even after faculty and administrators communicated their concerns to the Respondent about her behavior. Specifically, the Complainant alleged it received multiple reports from students and faculty that:

1. Students do not feel comfortable participating in classes they share with the Respondent because the Respondent allegedly posted derogatory and inflammatory remarks about the classmates and their class related comments on social media;

2. The Respondent allegedly engaged in a pattern of attacking students on social media who do not share the Respondent's views or with whom Respondent disagrees;

3. The Respondent allegedly engaged in similarly disruptive behavior in class and on course instruction platforms; and

4. One student reported that they did not feel comfortable meeting in person with Dean Walsh because they had heard the Respondent knew who came to Dean Walsh's office.

The Complainant alleged that as a result of the Respondent's behavior, students were unable to fully participate in the law school classroom and in extracurricular activities, and law school community members were impeded in their ability to engage in educational, administrative, professional and other functions. The Complainant alleged that the Respondent's actions and resulting impact constitute a violation of Offense numbers 2 and 4 under the University Student Conduct Code.

The Respondent denied the allegations.

***Procedural Background***

A hearing before the Student Conduct Board ("SCB" or "Panel") was originally scheduled for December 15, 2022 to determine whether a violation of the Code occurred. At the Respondent's request, it was rescheduled.

Phase One of the hearing took place over four different days, (February 24, March 20, April 5, April 11). During Phase One, the Panel heard evidence and considered whether it was more likely than not that the Respondent engaged in one or more violations of the Code. Under the Code, the Respondent is presumed innocent of the alleged violations.

***Relevant Provisions of the University Student Conduct Code Offenses***

| |
|---|
| University Student Conduct Code/2. Interfering with the rights – Interfering with the rights of other members of the University community or visitors to the University to engage in educational, recreational, residential, administrative, professional, business, and ceremonial activities or other functions.<br><br>University Student Conduct Code/4. Harassment, Stalking, Hazing, etc. – Threatening physical abuse, stalking, hazing, engaging in domestic, dating, or interpersonal violence, or any other conduct which harasses, threatens, or endangers the safety or health of any member of the University community or visitor to the University. |

***Phase One Summary***

Over the course of the first phase of the hearing, the Complainant presented evidence, including screenshots and direct testimony from witnesses, to illustrate its contention that the Respondent was consistently disruptive inside and outside of the classroom. The Complainant called several witnesses, including several students, a staff person and a faculty member who also serves as one of the vice deans of the Law School.

The Complainant's four student witnesses recalled in testimony how the Respondent's behavior discouraged themselves and/or others from fully participating in class or student group activities due to fears of uncomfortable confrontations with the Respondent. Furthermore, student witnesses noted that they and other classmates felt

that they could not fully participate in class because they were afraid of online retaliation from the Respondent.

The Complainant provided numerous screenshots from the Respondent's social media posts that had been shared with the Law School administration. The social media posts included several editorializations by the Respondent disparaging Law School faculty, students, and visitors.

Several of the documents the Complainant included in its evidentiary packet include emails to faculty and Law School administration both from named and anonymous law students expressing concerns regarding the Respondent's impact on student engagement and learning in the classroom, most notably her Criminal Law class.

The Complainant also included an extensive Canvas discussion between students in the Criminal Law class, including the Respondent, discussing the use of force against Black Lives Matter protestors and whether deadly force should be allowed against protestors who damage private property. At certain points, the discussion devolved into name-calling and character attacks, which ultimately led to the professor intervening and threatening to remove the ability for the class to interact on Canvas. The Respondent referred to one student's position as racist, but that student did not testify at the SCB hearing.

The Complainant also presented documentary evidence as well as witness testimony from one student, which indicated that there were conflicts with the Respondent within student chat forums (e.g. group text chains) and with the Black Law Student Association ("BLSA"). One student witness testified regarding a few conflicts that arose between the Respondent and a few members of BLSA, including disputes around in-person meetings, an overnight retreat, and the decision-making authority of leadership of the organization. Again, in group texts and on her social media posts, several of the Respondent's comments are abrasive, offensive, and derogatory. For example, the Respondent refers to two other students (not the witness) as "coon" in a group chat. One student witness told the Panel that she felt she was being harassed by the Respondent.

The Complainant also offered the testimony of Angela Smith, Assistant Dean of Diversity, Equity, and Inclusion and Peggie Smith, Professor and Vice Dean for Academic Affairs. Both witnesses described how they had become aware of the Respondent's behavior inside and outside of the classroom. They noted that they proactively reached out to the Respondent out of concern after hearing that the Respondent's behavior was concerning to peers and faculty in the Law School.

In the case of Vice Dean Smith, she met with the Respondent and encouraged her to be more careful in her interactions in the classroom, as her behavior could have a chilling effect on classroom dialogue, shutting down discussions and limiting opportunities for students to learn. She also told the Panel that she advised the Respondent that if one's

goal is to try to change hearts and minds and to convince people to open their eyes to racial harm from their words and actions, irrespective of intent, it would be useful for the Respondent to consider the value of using a less blunt tactic other than calling people racists or coons. Dean Smith shared that she gave the Respondent advice and a warning that if the Respondent were in her class, under no circumstance would she permit a student to call another student a racist and the Respondent would be out of her class.

Dean Elizabeth Walsh, who presented the case on behalf of the Complainant, also testified regarding the concerns she received from faculty and students as well as her own interactions with the Respondent. She told the Panel that she and the Criminal Law professor met with the Respondent to share how she was making students feel in the classroom and that her behavior was "chilling" speech. Dean Walsh acknowledged that the conversation did not go well and that the Respondent subsequently sent her an email with links about tone policing and the negative connotation of the word "professionalism" when used with black women. Dean Walsh told the Respondent she appreciated the resources and that, although it was not her intent, she apologized if she made the Respondent feel as if she was "tone policing" her. Dean Walsh said she was trying to help the Respondent understand how the Respondent was making her classmates feel.

The Respondent then began her case presentation. The Respondent first called one student witness to share their experience in the Race and the Law class with the Respondent. The student told the Panel that the Respondent did not derail their class or rob other students of their education. To the contrary, this student praised the Respondent for helping this particular class explore issues of race more deeply. In their written statement to the Panel, the student witness shared that the Respondent did not berate or shame other students who did not have the same lived experiences. The student shared that the Respondent inspired them to "refocus the lens through which [they] view society and [their] place in it."

The Respondent then went through each of her exhibits with the Panel. The Respondent's exhibits included statements of support from other students and faculty who had her in class. She also provided email exchanges with Professor Adrienne Davis and documents showing a grant she received to conduct research for the Center for the Study of Race, Ethnicity and Equity. She included emails between Law School administrators about the Respondent as well as multiple screenshots of her social media posts and exchanges with her classmates and with Law School administrators. The Respondent also provided articles about the use of the word "coon" and how its use has changed over time, particularly by members of the Black community such that some individuals believe that the word is not offensive or a slur.

The Respondent told the Panel that it was not her intention to disrupt classes or make other students feel that they could not fully participate in class. The Respondent noted that she is passionate about race and the law and often felt compelled to speak out in

certain classes because the instructors or classmates were not adequately contextualizing course content regarding race/ racism.

The Respondent said that she believes her fellow classmates and peers as well as the Law School faculty and administrators were "tone policing" her and that some of the students who complained about her are uncomfortable with current racial realities in America. She told the Panel that she only posted on social media to clear her name or when she felt her safety was in danger, although this assertion was questioned by the Complainant. The Respondent also asserted that some of the social media posts were intended as jokes.

The Respondent stated that after she was made aware of how her conduct was affecting the classroom environment, she changed her behavior. She claimed that she refrained from sharing course content on social media and became quieter in classes. The Respondent also noted that she resigned from her leadership position in the Black Law Students Association.

One Panel member asked how the Respondent reacted after being told people were uncomfortable with her language and in particular her use of the word coon.The Respondent answered that she understood the regional differences and discontinued using it. She also left a group chat of black first year law students, and she withdrew from that community.

The Respondent also pointed the Panel to read the letters of recommendation and written statements from law school faculty and students that attested to her positive contributions to classes. There were not any complaints of her behavior in these letters. The Respondent shared that she was offered an opportunity to work closely with Professor Adrienne Davis to conduct a project on critical race theory in the law school curriculum. There was also email evidence presented in which Professor Davis seemed to have a good relationship with the Respondent. One faculty letter from Professor Hollander-Blumoff noted that she had the Respondent in three of her classes. In her letter, Professor Hollander-Blumoff relayed that the Respondent asked thoughtful questions and brought a valuable lens to the course material. Professor Hollander-Blumoff stated that the Respondent was not disruptive to her teaching and that she had no information to suggest that other students felt threatened or uncomfortable as a result of the Respondent's class participation.

Following closing statements, Phase One of the hearing concluded. The Panel was given the instructions below (some of which had already been given during the hearing itself) and deliberated.

***Instructions to the Panel***

A. <u>Instruction about Blank Exhibits</u>

Before we begin with opening statements, I also wanted to mention for the Panel that you may have noticed a few exhibits that were intentionally left blank in Respondent's packet. I apologize for that, the Office of Student Conduct had some numbering issues. For efficiency purposes given the number of exhibits, I instructed Dean Gore to leave those exhibit numbers blank instead of trying to re-number all of the exhibits. The Panel should not draw any conclusions or inferences one way or the other based upon the fact that there are blank exhibit pages.

B. <u>Instructions about Title IX evidence and [Student X]</u>

1. The first instruction is to clarify references that have been made to two Title IX complaints filed involving Ms. Brown and another student, [Student X]. The Respondent, Ms. Brown, and [Student X] were the subject of Title IX cross-complaints against each other. In the complaint [Student X] filed against Ms. Brown, the Title IX office investigated and issued a finding of "no responsibility" on the part of Ms. Brown. In the complaint filed by Ms. Brown' against [Student X], the complaint was dismissed by the Title IX office and therefore no violation was found because the alleged behaviors and actions of [Student X] reported by Ms. Brown did not meet the definition of "sexual harassment" under Title IX, nor did the reported behaviors constitute a violation of the Student Conduct Code. These findings by the Title IX office do not constitute evidence for purposes of this Student Conduct Board proceeding, and this information is simply provided to offer the Panel additional context only. It is not to be relied on for purposes of making a decision in this case.
2. The Complainant has represented to the Chair that it is not relying on any communications or interactions between Ms. Brown and [Student X] as evidence in this matter to prove a violation of the Code. Accordingly, the SCB Panel is to disregard the reference in Complainant's Exhibit 22 where Respondent refers to [Student X] as a "little bitch." In addition, the SCB Panel is instructed to disregard and not consider all testimony referencing this particular comment.
3. The SCB Panel is to disregard and not consider the statements by [Student Witness 1] related to an individual who showed a "sex contract" to Ms. Brown and that Ms. Brown destroyed that person's reputation or the posting of pictures that may have labeled an individual a "rapist."

C. <u>Instruction about November 2nd class</u>

In addition, the Complainant has also represented that it is not relying on interactions from Professor Davis's class as evidence in support of the law school's case against the Respondent, Ms. Brown. Accordingly, the SCB Panel Is instructed to disregard and not consider the statements made by [Student Witness 1] suggesting Respondent made a professor cry.

D. Instruction on Prior Violation

The Panel has heard testimony and reviewed evidence regarding a prior student conduct violation by the Respondent related to violation of the Law School's recording privacy policy. The Panel is instructed that the evidence related to the law school recording policy and the Respondent's violation of that policy has already been adjudicated and is not a determination to be made by this Panel. The Panel is also instructed that it should not consider the mere fact that a prior violation exists as evidence that the Respondent is in violation of the allegations today. The evidence of the prior violation is only being offered by the Complainant for consideration of the Respondent's alleged pattern of behavior and impact on the community.

***Deliberations and Conclusions***

The Panel focused on the specific allegations set forth in the Complaint described at the outset of this decision and whether, "as a result of the Respondent's behavior, students were unable to fully participate in the classroom and in extracurricular activities and law school community members were impeded in their ability to engage in educational, administrative, professional and other functions."

The Panel recognizes that the Respondent posted inflammatory and disparaging remarks about classmates, faculty, law school administration, and visitors to the law school on social media and/or in group chat messages. The evidence clearly demonstrates that the Respondent would initiate and engage in argument and debate. At times, she openly insulted and criticized those who disagreed with her views, both in and outside of the classroom. The evidence is also clear that some students felt uncomfortable participating in class with the Respondent. Further, addressing these issues with the students and the Respondent took the time of Law School administration and faculty.

The question is whether, based on the preponderance of the evidence, the Respondent's actions rose to the level of harassment (Offense No. 4) or interfered with the rights of others to engage in educational, administrative, or other university activities (Offense No. 2).

Although the Panel agreed that the evidence demonstrated that the Respondent was disruptive at times and abrasive on occasion, they did not believe that there was sufficient evidence to establish that it was more likely than not the Respondent's conduct rose to the level of violating Student Conduct Code Offense Nos. 2 or 4.

It is important to note that the Student Conduct Code is not meant to limit free and open exchange of ideas and perspectives, as set forth below in the very first section of the Code's General Principles:

A. Purpose: The University Student Conduct Code sets forth community standards and expectations for Washington University students. These community standards and expectations are intended to foster an environment conducive to learning and inquiry. Freedom of thought and expression is essential to the University's academic mission. Respect for different points of view is essential. Nothing in this Code should be construed to limit the free and open exchange of ideas and viewpoints, even if that exchange proves to be offensive, distasteful, disturbing or denigrating to some.

**Offense No. 4**

The Panel quickly determined that there was insufficient evidence to establish that it was more likely than not the Respondent's actions constituted harassment or threatening behavior in violation of Offense No. 4.

The Respondent asked each of the witnesses called by the Complainant whether they felt threatened or harassed by the Respondent's behavior. Almost all of the witnesses responded that they did not feel threated or harassed by the Respondent.

The Panel did note that one student witness reported that they felt that the Respondent had harassed them. The Panel believed that this witness genuinely felt personal distress from her interactions with the Respondent. However, the Panel did not believe the Respondent's behaviors described by the witness in posting on the group chat and in challenging different decisions made by the witness and student group leadership rose to the level of harassment or threatening behavior under Offense No. 4.

**Offense No. 2**

The majority of the Panel's discussion during its deliberation focused on Offense No. 2 and whether the evidence was sufficient to establish that it was more likely than not that Respondent's actions and their impact on members of the law school community constituted interference with others' rights to engage in educational, recreational, administrative and other university activities in violation of the Code.

As described in the summary of the evidence above, several of the student witnesses indicated that the Respondent was disruptive at times and that they and other students felt uncomfortable engaging in class discussions. There was also email evidence from one professor and testimony from Law School administration expressing concern about the Respondent's behavior in and out of class and the potential chilling effect on other students in the classroom.

However, the Panel was not convinced that the Respondent was the sole cause of the students' discomfort and hesitation to participate in class.

Based upon the documentation submitted by the Complainant and the testimony of the Complainant's witnesses, most of the concerns around the Respondent's behavior centered around one class, Criminal Law and, to a lesser extent, Race and the Law. These are two classes where there were sensitive "hot button" topics discussed and challenging exchanges of ideas and viewpoints among the class, some of which may not have been well received. For example, as seen by the Criminal Law Canvas chat in evidence, the Respondent and her classmates engaged in a heated discussion about the looting of a Target store in the aftermath of George Floyd's murder.

Panelists noted that some of the Respondent's substantive points raised in class discussions and online around race/racism and privilege were legitimate. Panelists further noted that it is not surprising that some students would feel uncomfortable during those conversations; however, a student's discomfort or hesitation to participate in class may have been a result of the topics themselves.

The Complainant did not call upon any professors who had the Respondent in class to discuss the Respondent's behavior in and out of the classroom and its impact on their teaching or the students in their class. The Panel was interested in how the professors in those classes handled difficult classroom conversations with the Respondent and her classmates, including how they introduced controversial topics, laid conversation ground rules, or made attempts to heal the classroom after heated discussions.

The Panel did not find there to be sufficient evidence of the Respondent intentionally or systematically disrupting classroom instruction. The Respondent provided a detailed statement from another Law School professor who taught the Respondent in three different courses, and the professor's reviews of the Respondent's contributions in class were very positive, as noted above. Furthermore, there was some documentation that indicated the Respondent modified her behavior in classes after some faculty and administrators talked to her about the impact she was having on students in the classroom.

Regarding the evidence of the Respondent's posts on social media and group texts provided by the Complainant, the Panel was not convinced there was sufficient evidence to demonstrate that the Respondent's social media or text chain posts interfered with the rights of other students to fully participate in their educational or recreational activities. Several witnesses indicated that they had seen or heard about the Respondent's social media accounts, including calling out certain professors, visitors, and students. The Panel does not condone the Respondent's usage of social media or her posts on the group texts. Nor did the Panel find the Respondent's testimony suggesting that she only posted to proactively correct narratives or when she felt unsafe or threatened to be credible. However, the Panel did not believe that there was sufficient evidence to establish that it was more likely than not that these social media posts and group text exchanges interfered with the rights of other students, faculty or staff to engage in their educational, recreational, administrative, or other university functions.

***Appeal***

The Code does not permit the University to appeal. Accordingly, this decision is final.

Signed:

Darrell Hudson, PhD
University Student Conduct Board Chair

**Exhibit J - Instagram Screenshots; Millions of Views, Thousands of Comments**







3:55
57
Reel insights
me leaving my first law school because I wasn't allowed to say the words "yt supremacy" or "ræçism" in my "race in the law" class
stay away from Missouri folks.
November 12, 2023 · Duration 0:05
2.8M
119K
695
--
128
2.6K
No insights available


Reel insights
want to watch me lose
my $40,000+ scholarship
to law school in 30 seconds?
79K
522
3K
3.6K
9.9K
Overview
Engagemen
t
Audience
Summary
Views
1,852,034
Accounts reached
1,013,596
Average watch time
33s
Follows
2,318
Views
1,852,034

**Exhibit K - Plaintiff's Service to Defendants' Registered Agent**



Exhibit A

CM/ECF Civil Criminal Query Reports Utilities Search Help Log Out

| | | |
|---|---|---|
| 06/09/2026 | 7 | MOTION to Amend/Correct 1 Complaint *against Defendants* by ALLISON BROWN. (BROWN, ALLISON) (Entered: 06/09/2026) |
| 06/10/2026 | 8 | RESPONSE re 4 MOTION for Entry of Default *against Defendants* MOTION for Default Judgment as to *sum certain /Opposition to Plaintiff's Motion for Default Judgment* filed by CARRIE BURNS, ADRIENNE DAVIS, NICOLE GORE, DARRELL HUDSON, MARK KAMIMURA-JIMENEZ, ELIZABETH KATZ, RUSSELL OSGOOD, ANGELA SMITH, PEGGIE SMITH, ELIZABETH WALSH, WASHINGTON UNIVERSITY, WASHINGTON UNIVERSITY SCHOOL OF LAW, DEANNA WENDLER-MODDE, ROBERT WILD. (Rewari, Sona) (Entered: 06/10/2026) |
| 06/11/2026 | 9 | ORDER advising Plaintiff to respond to Defendants' 6 Motion to Dismiss or file an amended complaint pursuant to Rule 15(a)(1) by June 29, 2026, or by Court may deem Defendants' motion as conceded. Signed by Judge Christopher R. Cooper on 6/11/2026. (lccrc1) (Entered: 06/11/2026) |
| 06/11/2026 | | MINUTE ORDER denying Plaintiff's 4 Motion for Default and Motion for Default Judgment as moot. Signed by Judge Christopher R. Cooper on 6/11/2026. (lccrc1) (Entered: 06/11/2026) |
| 06/12/2026 | 10 | Mail Returned as Undeliverable re Minute Order on Motion for CM/ECF Password sent to Allison Brown on 4/8/2026. New Address not provided; unable to forward. (lsj) (Entered: 06/12/2026) |
| 06/29/2026 | 11 | AMENDED COMPLAINT against All Parties with Jury Demand filed by ALLISON BROWN, Ian Dubin, Cynthia Copeland.(BROWN, ALLISON) (Entered: 06/29/2026) |

Plaintiff served Defendants' registered agent with the Amended Complaint on June 29th, 2026.